EL DIA, INC., et al., Plaintiffs, Appellees,

v.

Rafael HERNANDEZ COLON, Defendant, Appellant.

No. 91–1868.

United States Court of Appeals, First Circuit.

Heard March 3, 1992.

Decided May 7, 1992.

Lino J. Saldana, with whom Saldana, Rey & Alvarado, Marcos A. Ramirez Irizarry, and Ramirez & Ramirez were on brief, for defendant, appellant.

E. Susan Garsh, with whom Jonathan M. Albano, Bingham Dana & Gould, Daniel R. Dominquez, Carmen Irizarry de Dominguez, and Dominguez & Totti were on brief, for plaintiffs, appellees.

James E. O'Connell, Jr., Murphy and O'Connell, Jane E. Kirtley, and Rebecca Daugherty on brief, for Reporters Committee for Freedom of the Press, amicus curiae.

Before BREYER, Chief Judge, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

The Governor of Puerto Rico appeals from a judgment that struck down an Executive Order on constitutional grounds. *El Dia, Inc. v. Hernandez Colon*, 783 F.Supp. 15 (D.P.R.1991). We direct the district court to vacate its grant of declaratory and injunctive relief.

## I. THE EXECUTIVE ORDER

On April 15, 1991, in the roiled wake of a bitter controversy anent public access to government documents, and most especially, access to records reflecting the chief executive's off-island travel expenses, Governor Hernandez Colon issued Executive Order OE 1991–15. The Executive Order is reproduced in an appendix to the district court's rescript. *See El Dia, Inc.*, 783 F.Supp. at 27–31.

The Order starts with six unnumbered "whereas" clauses. For the most part, these hortatory clauses limn a series of underlying aspirations. The fourth clause recites a litany of nine factors which, in the Governor's view, ought properly to restrict rights of access to public documents. In its directory paragraphs, the Order commands a broad array of government agencies "to establish the necessary internal regulations for the search, evaluation, inspection and reproduction of the public documents requested by ... interested persons and to establish [fee schedules for same]." *Id.* at 28.[1] While the agencies retain some latitude in framing regulatory particulars, each agency's rules must cover eleven specific points "as a minimum."

The Order's "minimum requirements ... t[ook] effect as an emergency measure in each of the Agencies" on April 15, 1991. *Id.* at 31. Each agency was directed "to establish its necessary rules for compliance with th[e] Executive Order" within sixty days thereafter. *Id.*

## II. THE CHALLENGE

On April 22, 1991, El Dia, Inc., the publisher of a daily newspaper, and Andrea Martinez de Jesus, a reporter, sued in the United States District Court for the District of Puerto Rico to declare the Order unconstitutional and enjoin its enforcement.[2] The plaintiffs charged that several of the Order's provisions violated their First Amendment right of informational access; impermissibly chilled expression; thwarted freedom of the press; contravened due process; and undercut equal protection of the laws. On April 25, the plaintiffs filed a somewhat similar complaint in the Puerto Rico Superior Court. The paramount difference between the two suits was that the plaintiffs' federal court action sought relief under *federal* law (principally, the United States Constitution) whereas the plaintiffs' superior court action sought relief under *local* law (principally, P.R.Laws Ann. tit. 32, § 1781).[3]

In response to the federal action, the Governor raised questions about the plaintiffs' standing. He also claimed that the Order filled a regulatory void and comprised a "vehicle for access" rather than a restriction upon it. The Governor contended, furthermore, that the Order constituted a permissible regulation of expressive activities—a regulation whose terms and principles were anchored in, and would be interpreted by reference to, Puerto Rican jurisprudence. The Governor's response to the superior court action, although not a part of the present record, was presumably along the same lines.

The early bird does not always catch the worm. Despite the fact that the federal suit had a three-day head start, matters proceeded more celeritously in the newer action. On April 30, the superior court granted a preliminary injunction (the TRO) blocking enforcement and implementation

---

1. The Order affects a googol of entities:
 For the purposes of this Executive Order, the term "Agency" means any board, body, examining board, public corporation, commission, independent office, division, administration, bureau, department, authority, official, person, entity or any instrumentality of the Executive Power of the Commonwealth of Puerto Rico, to include the Governor's Own Office.... [but] the term "Agency" does not include the University of Puerto Rico.
 *El Dia, Inc. v. Hernandez Colon,* 783 F.Supp. 15, 30–31 (D.P.R.1991).

2. The plaintiffs' suit was originally brought against the Governor, the Secretary of Justice, and the Commonwealth. The district court granted summary judgment in favor of the latter defendants.

3. The Puerto Rico statute provides:
 Every citizen has a right to inspect and take a copy of any public document of Puerto Rico, except as otherwise expressly provided by law.
 P.R.Laws Ann. tit. 32, § 1781 (1968).

of OE 1991–15 "until a final decision is made as to whether [OE 1991–15] is or is not a valid regulatory exercise on the part of the [Commonwealth]." The TRO is still in force.

Notwithstanding their success in obtaining the TRO, the plaintiffs continued to press the federal court action. In due course, the opposing sides cross-moved for summary judgment. On July 18, 1991, the district court granted plaintiffs' motion against Hernandez Colon. *El Dia, Inc.*, 783 F.Supp. at 27. The court resolved the issue of standing in plaintiffs' favor, concluding "that the executive order effectively deters [plaintiffs] in obtaining information from the government, thus, they have a cognizable injury that can be redressed by this court." *Id.* at 19. Having reached the merits, and discerning no genuine issues of material fact, the court ruled that a qualified First Amendment right of access existed with respect to government documents such that access thereto could be curtailed only on the basis of a "substantial compelling interest." *Id.* at 23. The court found that, far from achieving this benchmark, the Order unduly burdened "the flow of information," thereby "inhibit[ing] public criticism of public officials." *Id.* at 21. In the court's view, the resultant restraint was "inconsistent with the First Amendment," *id.*, and, moreover, infracted constitutional guarantees of due process and equal protection. *See id.* at 25. The district court declared the Order a nullity and permanently enjoined the Governor from enforcing it. *Id.* at 27. This appeal followed.

III. STANDARD OF REVIEW

■ Some courts of appeals exhibit no deference whatever to the trier in the declaratory judgment context, affording plenary review of orders granting or denying declaratory relief. *See, e.g., Allstate Ins. Co. v. Mercier*, 913 F.2d 273, 277 (6th Cir. 1990); *Gayle Mfg. Co. v. Federal Sav. & Loan Ins. Corp.*, 910 F.2d 574, 578 (9th Cir.1990); *see also Hanes Corp. v. Millard*,

531 F.2d 585, 591 (D.C.Cir.1976) (grants or denials of declaratory relief are subject to "quite searching review"). Other courts of appeals show greater respect to the trier, affirming unless an abuse of discretion looms. *See, e.g., Christopher P. v. Marcus*, 915 F.2d 794, 802 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991); *Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1273 (10th Cir.1989).

■ We have occupied the middle ground, utilizing a form of independent review when passing upon orders granting or withholding declaratory relief. *See National R.R. Passenger Corp. v. Providence & Worcester R.R. Co.*, 798 F.2d 8, 10 (1st Cir.1986) ("Our review of a district court's decision to grant or deny declaratory relief is conducted under a standard slightly more rigorous than abuse of discretion."); *accord Century Indem. Co. v. McGillacuty's, Inc.*, 820 F.2d 269, 270 (8th Cir.1987). This approach requires that we attentively digest the facts and the district court's stated reasons for granting or withholding declaratory relief. If we conclude that a different result should have been reached, then we will reverse or modify the judgment below. If, however, the decisional scales tip in favor of the district court's solution, or if the scales are in equipoise, then the judgment will stand. Bluntly put, we cede some deference to the trier, especially as to findings of fact, but we will not hesitate to act upon our independent judgment if it appears that a mistake has been made. *Accord Century Indem.*, 820 F.2d at 270.

■ The posture of the instant appeal also affects the calculus of review. Here, the lower court acted on cross-motions for summary judgment rather than after a trial or evidentiary hearing. In that mode, the judge could not serve as a factfinder; rather, he was required to scrutinize the record in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.[4] *See Griggs–Ryan v. Smith*, 904

---

4. The fact that the parties cross-moved for *brevis* disposition neither alters the summary judgment praxis nor authorizes the district court to resolve factual disputes. In such a situation,

F.2d 112, 115 (1st Cir.1990); *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir. 1989). Clearly, the case for deference is at its lowest ebb in a situation like this one, where the district court was powerless either to make credibility determinations or to resolve factual conflicts.

We must, therefore, afford a particularly stringent version of independent review to the judgment below.[5]

## IV. DISCUSSION

■ The Declaratory Judgment Act is uncommon in that it neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies.[6] *See Green v. Mansour,* 474 U.S. 64, 72, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985); *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952); *Terra Nova Ins. Co. v. 900 Bar, Inc.,* 887 F.2d 1213, 1222 (3d Cir.1989). In other words, declaratory relief, both by its very nature and under the plain language of 28 U.S.C. § 2201, is discretionary. *Public Affairs Assocs., Inc. v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 581, 7 L.Ed.2d 604 (1962) (per curiam); *Kunkel,* 866 F.2d at 1273. The federal courts' obligation to decide virtually all questions within their jurisdiction is, to that extent, curtailed when complainants seek declaratory relief. *See Mitcheson v. Harris,* 955 F.2d 235, 237–38 (4th Cir.1992); *Terra Nova,* 887 F.2d at 1222.

■ Declaratory judgment actions, being statutory creatures, are neither inherently legal nor inherently equitable. *See Moretrench Am. Corp. v. S.J. Groves & Sons Co.,* 839 F.2d 1284, 1286 (7th Cir. 1988); *American Safety Equip. Corp. v.*

*J.P. Maguire & Co.,* 391 F.2d 821, 824 (2d Cir.1968). Nonetheless, it is sometimes desirable for courts to ascertain whether a particular suit for declaratory relief is grounded in law or in equity." We think such an inquiry is useful here. We must, then, determine "whether, in the absence of the Declaratory Judgment Act, the suit brought would have been legal or equitable in nature." *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 795 F.2d 1111, 1114 (1st Cir.1986). Looking to the basic nature of the plaintiffs' case and the manner in which the issues would likely have arisen if the Declaratory Judgment Act had been stillborn, we conclude, without serious question, that this suit is equitable in nature and, therefore, governed by traditional principles of equity jurisprudence.

■ The judicial discretion which inheres in the declaratory judgment context should be exercised circumspectly and, in an "equity-like" suit, in accordance with traditional equity principles. *Cf., e.g., First Fed. Sav. & Loan Ass'n v. Greenwald,* 591 F.2d 417, 424 (1st Cir.1979) (noting that the withholding of federal declaratory relief because of pending state proceedings is governed by traditional equitable canons). Although declaratory relief frequently serves a valuable purpose and courts must remain reasonably receptive to suitable requests for it, *see Cincinnati Ins. Co. v. Holbrook,* 867 F.2d 1330, 1333 (11th Cir.1989) (per curiam), there are limits to that receptivity. *See Mitcheson,* 955 F.2d at 236 (holding that, under particular circumstances, "relevant state interests ... should have led the district court to exercise its statutorily provided discretion to decline to entertain [a] declaratory judgment action"); *Beacon*

---

"the court must evaluate each motion separately, being careful to draw inferences against each movant in turn." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990).

**5.** The lower court's grant of injunctive relief does not change either the essential character of plaintiffs' action or the standard of review. *See infra* note 12.

**6.** The Declaratory Judgment Act reads in relevant part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. 28 U.S.C. § 2201 (1988).

*Constr. Co. v. Matco Elec. Co.,* 521 F.2d 392, 397 (2d Cir.1975) ("While a district judge has discretion in determining whether to grant declaratory relief and is not precluded from granting relief by the existence of other remedies, his discretion is not unlimited."). Especially when matters of great public moment are involved, declaratory judgments should not be pronounced "unless the need is clear, not remote or speculative." *Washington Pub. Power Supply Sys. v. Pacific Northwest Power Co.,* 332 F.2d 87, 88 (9th Cir.1964).

■ In exercising this bounded discretion, a court, once satisfied that the constitutional prerequisites of jurisdiction and justiciability have been met, should consider the totality of the circumstances. Affording independent review to the record before us, giving due weight to appropriate prudential considerations, and bearing in mind the equitable features of plaintiffs' suit, we conclude that, in the special circumstances of this case, the lower court erred in glossing over the existing TRO and granting a declaration of rights. Wary of belaboring the obvious, we merely summarize the five key factors which underlie our conclusion.

■ 1. A factor which is always to be considered in determining whether to grant declaratory relief in constitutional cases is the need for courts to be chary about adjudicating constitutional rights by means of declaratory judgment actions. Uncertain questions of constitutional law should be addressed only when absolutely necessary. *See Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945) ("It has long been [this Court's] considered practice not ... to decide any constitutional question in advance of the necessity for its decision...."); *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346–55, 56 S.Ct. 466, 482–87, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *see also Aggar-*

*wal v. Ponce School of Medicine,* 745 F.2d 723, 726 (1st Cir.1984) ("It has long been a basic tenet of the federal courts to eschew the decision of cases on constitutional grounds unless and until all other available avenues of resolution were exhausted."). Hence, courts should withhold declaratory relief as a matter of discretion if such redress is unlikely to palliate, or not needed to palliate, the fancied injury, especially when refraining from issuing a declaratory judgment "avoid[s] the premature adjudication of constitutional issues." *Penthouse Int'l, Ltd. v. Meese,* 939 F.2d 1011, 1019–20 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1513, 117 L.Ed.2d 650 (1992).[7]

■ We do not suggest that adjudicating constitutional rights in declaratory actions is never appropriate. We do suggest, however, that allowing too easily available declaratory relief has a marked tendency to erode the postulate that needless adjudication of constitutional questions should be avoided. *See, e.g., Kelly v. Illinois Bell Tel. Co.,* 325 F.2d 148, 151 (7th Cir.1963); *Fletes–Mora v. Brownell,* 231 F.2d 579, 581 (9th Cir.1955). In this vein, we believe that declaratory judgments concerning the constitutionality of government conduct will almost always be inappropriate when the constitutional issues are freighted with uncertainty and the underlying grievance can be remedied for the time being without gratuitous exploration of uncharted constitutional terrain. *See Penthouse Int'l,* 939 F.2d at 1020; *Gross v. Fox,* 496 F.2d 1153, 1154–55 (3d Cir.1974). This is such a case.

■ The very best that can be said for plaintiffs' position is that the constitutional issues are fuliginous. While the Supreme Court has recognized a qualified First Amendment right of access to records and proceedings connected to the criminal justice system, *see, e.g., Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enter-*

---

**7.** *Penthouse* is particularly instructive for the purpose at hand. Observing that the Supreme Court had shown a reluctance to decide the precise First Amendment issue there at stake—whether government criticism of publications violated the First Amendment rights of publish-

ers—the District of Columbia Circuit affirmed the district court's declination to render a declaratory judgment until such time as the issue was more squarely presented. *See Penthouse,* 939 F.2d at 1020.

*prise II*); *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I*); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Court has never recognized a corresponding right of access to Executive Branch documents. What is more, even in the criminal justice system cases, the Court has explicated a demanding standard as a prerequisite to finding a constitutionally assured right of access. This standard asks whether the Anglo–American legal system traditionally has allowed public access to the material in question; and whether access "plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II*, 478 U.S. at 8, 106 S.Ct. at 2740; *see also Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1175 (3d Cir.1986) (outlining test).

In this situation, we are doubly skeptical. In the first place, we seriously question whether *Richmond Newspapers* and its progeny carry positive implications favoring rights of access outside the criminal justice system.[8] In the second place, we doubt whether plaintiffs' shotgun attack could conceivably meet the rigors of the Court's criteria for access. We need not resolve these doubts today, but mention them merely to illustrate the problematic nature of the plaintiffs' constitutional claims.

■ Unsettled constitutional questions should be decided only as a last resort. Since that is so, and since the plaintiffs were fully protected for the time being by the TRO—a remedy grounded in Puerto Rico law, not in the federal Constitution—

we think the district court acted too hastily. By leaping into the fray even though, as a practical matter, there may no longer have been any fray into which to leap, the court interposed itself in a heated political controversy at a time when the likelihood of injury was remote, the need for federal intervention difficult to grasp, and the status of the claimed constitutional rights shrouded in uncertainty. The circumstances call to mind Justice Reed's warning: "Should the courts seek to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would become the organ of political theories." *United Public Workers v. Mitchell*, 330 U.S. 75, 90–91, 67 S.Ct. 556, 565, 91 L.Ed. 754 (1947).

■ 2. A second key factor is the extent to which the federal case was ripe for adjudication. Ordinarily, courts use a two-part test in determining ripeness. *See Abbott Lab. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). First, we consider whether an issue is fit for review, e.g., whether a challenged government action is final and whether determination of the merits turns upon facts which may not yet be sufficiently developed. *See W.R. Grace & Co. v. United States EPA*, 959 F.2d 360, 364 (1st Cir. 1992). Second, we consider the question of "hardship," a question which "typically turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties." *Id.* (citations omitted).

■ Whether the plaintiffs' claims were ripe under this test is difficult to say. At initial blush, it would seem not, except for the fact that plaintiffs claimed, *inter alia*, that the Order was invalid on its face. A

---

**8.** *See, e.g., Houchins v. KQED, Inc.*, 438 U.S. 1, 9, 98 S.Ct. 2588, 2593, 57 L.Ed.2d 553 (1978) (Burger, C.J.; plurality opinion) ("This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control."); *id.* at 15, 98 S.Ct. at 2597 ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information...."); *id.* at 16, 98 S.Ct. at 2597 (Stewart, J., concurring) ("The First and Fourteenth Amendments do not

guarantee the public a right of access to information generated or controlled by government...."); *see also Globe Newspaper Co.*, 457 U.S. at 611, 102 S.Ct. at 2622 (O'Connor, J., concurring) (suggesting that neither *Globe Newspaper* nor *Richmond Newspapers* should be read as implying a right of access beyond the criminal justice system); *Calder v. IRS*, 890 F.2d 781, 783–84 (5th Cir.1989); *Capital Cities Media*, 797 F.2d at 1173.

facial challenge of this sort, implicating First Amendment values, customarily works a relaxation of the ripeness criteria. *See, e.g., Martin Tractor Co. v. Federal Election Comm'n*, 627 F.2d 375, 380 (D.C.Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980). But, that generality, taken in a vacuum, is misleading. The reason that "First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection [stems from] the fear of irretrievable loss." 13A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3532.3, at 159 (2d ed. 1984). At the time the court below acted, any such fear was unfounded, for the TRO remained in force. Unless and until the TRO is lifted—an event that can only occur after notice and hearing—an actual dispute regarding access to documents under the Governor's as-yet-unimplemented directive simply cannot persist. Thus, any claim of injury, or any fear that persons' rights will be irremediably lost, is necessarily speculative.

In addition, unlike in most "facial challenge" cases, the government action under siege (the Order) is of dubious finality. Although the Order contains a provision making its "minimum requirements" immediately effective as an "emergency measure," much of what the district court found objectionable is recited only in the series of aspirational "whereas" clauses. It is elementary that these hortatory pronouncements do not, in themselves, work an alteration in the plaintiffs' rights, duties, or obligations. Their embodiment in the Order is merely a precursor to the later formulation of actual regulations by the affected agencies—regulations which have not yet been promulgated. This scenario, then, bears a strong resemblance to agency action that this court found insufficiently final in *Roosevelt Campobello Int'l Park Comm'n v. United States EPA*, 684 F.2d 1034, 1040 (1st Cir.1982) (declining to review, as unripe, a directive for "further administrative action" which, in and of itself, "makes no change in the status quo").

In sum, regardless of whether the case, strictly speaking, is unripe—and we are willing to assume, for argument's sake, that it is not—the policies that underscore the ripeness doctrine militate strongly against granting discretionary (declaratory) relief.

■ 3. A third key factor touches upon the desirability of abstention. Although it is doubtful that the district court was *required* to abstain, as we understand the various abstention theories currently in vogue, *see, e.g., Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941),[9] the mere fact that the district court was not required to abstain does not mean that the court was free to ignore certain amaranthine principles that endure as imperatives even in cases which, technically, lie beyond abstention's doctrinal reach. *See Puerto Rico Int'l Airlines, Inc. v. Silva Recio*, 520 F.2d 1342, 1345 (1st Cir.1975) (holding that, even when abstention doctrines do not command a federal court to abjure legal questions involved in a pending state action, "normal equitable principles ... [nevertheless] require an assessment of the countervailing interests of the parties").

■ The unity of concerns underlying abstention in cases involving broad facial attacks on state laws is threefold. *Pull-*

---

9. To be sure, plausible arguments can be made for abstention here. *Pullman* abstention might lie, given that the proceedings before the Puerto Rico courts had the realistic potential to eliminate any need for adjudicating federal constitutional issues. *Cf., e.g., Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 85, 95 S.Ct. 870, 876, 43 L.Ed.2d 32 (1st Cir.1984). *Younger* abstention might also be appropriate: after all, the district court's decree plainly interfered with, and undermined, ongoing consideration of the Order's validity in the Puerto Rico courts. *Cf., e.g., Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979); *Bettencourt v. Board of Registration in Medicine*, 904 F.2d 772, 777 (1st Cir.1990). There are, however, problems with each of these approaches. Rather than prolonging our task, we assume, for present purposes, that the district court was under no compulsion to abstain.

*man* evidences the concern that federal courts will be forced to interpret local law without a local court first adumbrating its sweep, thereby rendering the federal court decision advisory in nature. *See Pullman,* 312 U.S. at 500, 61 S.Ct. at 645. A second, and related, concern is the need for a concrete case or controversy. *See Moore v. Sims,* 442 U.S. 415, 428, 99 S.Ct. 2371, 2378, 60 L.Ed.2d 994 (1979). The final concern prompted by such broad-based challenges is the threat to federalism. *See id.* at 429–30, 99 S.Ct. at 2380–81. These concerns suggest that, when a state court has matters well in hand, withholding federal declaratory relief premised on constitutional grounds will maintain and facilitate federalism; foster state-created accommodations of constitutional principles and state interests; and husband federal judicial resources. Whether or not abstention is required, these core values are highly relevant in deciding if discretionary relief should be granted. Here, they unambiguously counsel in favor of judicial restraint.[10] *Cf. Romany v. Colegio de Abogados,* 742 F.2d 32, 43 (1st Cir.1984) (when a local court has already acted and "demonstrated its awareness of the constitutional problem, we think the federal courts should be slow to come between it and the remedial steps it is contemplating").

4. A fourth key factor supporting eschewal of federal declaratory relief is our keen interest in nourishing comity between federal and commonwealth courts. *See Mitcheson,* 955 F.2d at 239 (recognizing promotion of comity as an appropriate concern in determining whether to grant declaratory relief); *Silva Recio,* 520 F.2d at 1345 (prevention of "unnecessary federal-state friction" is properly considered when declaratory relief is requested); *cf. Rosario–Torres v. Hernandez–Colon,* 889 F.2d 314, 323 (1st Cir.1989) (en banc) ("In shaping equitable remedies, comity concerns can loom large."). Here, the plaintiffs

challenge the legality of an action taken under color of office by Puerto Rico's highest elected official. The Puerto Rico statutes, unlike the federal Constitution, contain an express guarantee of public access to government records. *See* P.R. Laws Ann. tit. 32, § 1781, quoted *supra* note 3. Though the federal action was docketed a few days earlier, the superior court seized the initiative, acted expeditiously, and afforded relief sufficient to ease any immediacy of need. The goals of comity would, therefore, have been better served had the district court deferred the requested ruling.

5. The final factor which enters into the picture is the equity-like nature of plaintiffs' action. Simply because an equitable remedy may be available does not necessarily mean that it must automatically issue. *See Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 193, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978); *SMA Life Assurance Co. v. Sanchez–Pica,* 960 F.2d 274, 276 (1st Cir.1992). As we have said in a slightly different setting, "the hallmark of equity is the ability to assess all relevant facts and circumstances and tailor appropriate relief on a case by case basis." *Rosario–Torres,* 889 F.2d at 321. Given the decidedly odd concatenation of circumstances, several equitable considerations suggest that federal declaratory relief, when and as granted, was inconcinnous.

For one thing, it is a "basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger,* 401 U.S. at 43–44, 91 S.Ct. at 750. Although plaintiffs may have lacked an adequate remedy *at law,* remediation was already in hand in another forum. Thus, denial of a federal anodyne would have worked no irreparable injury, and in all probability, no injury at all. Fed-

---

**10.** We think the *Moore* Court's insights bear repeating at this juncture:

Almost every constitutional challenge ... offers the opportunity for narrowing constructions that might obviate the constitutional problem and intelligently mediate federal constitutional concerns and state interests.

When federal courts disrupt that process of mediation while interjecting themselves in such disputes, they prevent the informed evolution of state policy by state tribunals.

*Moore v. Sims,* 442 U.S. at 429–30, 99 S.Ct. at 2380.

eral courts should not rush to judgment when declaratory relief would produce "uncoordinated and unnecessarily disruptive adjudications of disputes in which state and federal issues are intertwined." *Geni–Chlor Int'l, Inc. v. Multisonics Dev. Corp.,* 580 F.2d 981, 985 (9th Cir.1978).

For another thing, "[e]quity must always be mindful of the public interest." *Rosario–Torres,* 889 F.2d at 323. It follows ineluctably that "[d]eclaratory relief like other equitable remedies should be granted only as a matter of judicial discretion, exercised in the public interest." *Silva Recio,* 520 F.2d at 1345. In this case, the public interest would have been advanced by acknowledging the TRO, avoiding overlapping court proceedings, and allowing the Puerto Rico Superior Court an opportunity to thrash out the legality of the Governor's Executive Order as a matter of Puerto Rico law, at least in the first instance.

Third, equity acts in the present. Thus, the primary requirement for equitable relief is that it will be effective in accomplishing its remedial purpose. *See Stewart v. United States,* 327 F.2d 201, 203 (10th Cir. 1964) ("[E]quity will not require a useless thing...."). In this case, the federal court's order, when rendered, gave the plaintiffs a stunning victory on a broader front, but, in the narrow confines of the case, gave them nothing that they did not already effectively enjoy under the terms of the TRO.

## V. CONCLUSION

 This is a case where the whole is greater than the sum of the individual

parts. While any one of the factors we have mentioned, taken in isolation, may not have warranted denying federal declaratory relief, their combined force is overpowering. We see no sign that these, and other, pertinent considerations were adequately weighed by the court below.[11] These concerns lead us to believe that the district court should have been more appreciative of the situational realities and, conversely, less ready to stride headlong into a constitutional thicket. Under all the circumstances—the novelty of plaintiffs' constitutional theories, the questions the Governor raised anent plaintiffs' standing, the conjectural nature of the government action (the Order, after all, was neither final nor self-executing, and the individual agencies had not yet promulgated regulations to implement it), the specificity of the applicable Puerto Rico statute, the interest of the Commonwealth and its citizens in determining the legality of the Order under that statute, the pendency of a parallel action between the same parties, the alacrity with which the superior court responded to that suit, the scope of protection afforded by the TRO, the respect properly to be accorded by a federal court to a state court that has matters well in hand, the desirability of conserving scarce judicial resources, the balance of the relevant equities, the plaintiffs' inability to demonstrate any ongoing injury, and the absence of any irreparable harm—there was no sound basis for granting a declaratory judgment.[12] To the contrary, the course of prudence and informed discretion was to withhold, at least for the time being, the relief requested.

---

**11.** In fairness to the district court, we note that appellant never specifically requested that relief be denied as a matter of discretion. We believe, however, that, just as a federal court must independently satisfy itself about basic concerns such as subject matter jurisdiction, mootness, ripeness, and standing, so it must independently satisfy itself about the suitability of granting discretionary relief under the Declaratory Judgment Act.

**12.** It is beside the point that injunctive relief was also requested and received. An injunction will not issue when the threatened harm has abated and no more than the mere possibility of recurrence can be shown. *See Lopez v. Garriga,*

917 F.2d 63, 67 (1st Cir.1990) (requiring "likelihood of future unlawful conduct on the defendant's part"). Moreover, applying our conventional four-part test, which concentrates on the probability of merits success, the existence *vel non* of irreparable harm, the impact on the public interest, and the balance of relevant equities, *see, e.g., K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 914–15 (1st Cir.1989), and bearing in mind that the injunction depended on the validity of the district court's declaration that OE 1991–15 was null and void, we do not think plaintiffs made a showing sufficient to warrant injunctive relief.

We need go no further. Three decades ago, the Supreme Court "cautioned against [granting] declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations." *Rickover*, 369 U.S. at 112, 82 S.Ct. at 582. In the absence of a clear need for federal intervention, we believe that the court below should have heeded this wise counsel.

*The judgment below is reversed. The case is remanded to the district court with directions to vacate its previous orders. Costs in favor of appellant.*