# United States Court of Appeals
## For the First Circuit

No. 18-1686

ALGONQUIN GAS TRANSMISSION, LLC,

Plaintiff, Appellee,

v.

WEYMOUTH, MASSACHUSETTS; WEYMOUTH CONSERVATION COMMISSION,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,[*]
And Selya, Circuit Judge.

Rebekah Lacey, with whom J. Raymond Miyares, Bryan F. Bertram, Miyares & Harrington, LLP, and Joseph Callanan, Town Solicitor, Town of Weymouth, were on brief, for appellants.
Jeremy C. Marwell, with whom Michael B. Wigmore, Joshua S. Johnson, Vinson & Elkins LLP, James T. Finnigan, and Rich May, P.C. were on brief, for appellees.

March 19, 2019

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**KAYATTA**, **Circuit Judge**.  Algonquin Gas Transmission, LLC ("Algonquin") seeks to build a natural gas compressor station in Weymouth, Massachusetts as one component of Algonquin's larger effort to improve its natural-gas delivery infrastructure in the northeastern United States.  Algonquin has received a certificate of public convenience and necessity ("CPCN") from the Federal Energy Regulatory Commission ("FERC"), but that certificate is conditioned upon the receipt of a consistency determination from the Commonwealth of Massachusetts pursuant to the Coastal Zone Management Act ("CZMA").  To complete its CZMA review, Massachusetts requires Algonquin to furnish a permit from the Massachusetts Department of Environmental Protection ("MassDEP").  But MassDEP will not issue such a permit until the Town of Weymouth approves the project under its local ordinance or a court finds that ordinance preempted as applied to the project.

After unsuccessfully seeking Weymouth's approval to begin construction, Algonquin repaired to the U.S. District Court for the District of Massachusetts, from which it obtained a ruling that Weymouth's ordinance, as applied to the project, is indeed preempted.  Weymouth now appeals that ruling.  For the following reasons, we affirm.

**I.**

We briefly survey the regulatory topography, the pertinent facts, and the procedural history in this case.

- 2 -

## A.

The federal Natural Gas Act ("NGA") governs the transportation and sale of natural gas in interstate commerce and the importation and exportation of natural gas in foreign commerce. See 15 U.S.C. § 717(b). The NGA requires a prospective developer to obtain a CPCN from FERC prior to constructing a jurisdictional natural gas pipeline or ancillary facility. Id. § 717f(e). FERC must issue a CPCN if the applicant demonstrates that it "is able and willing . . . to conform to the provisions of [the Act] . . . and regulations of [FERC]" and the proposed construction is "required by the present or future public convenience and necessity." Id. In issuing a CPCN, FERC also has the authority to impose "reasonable terms and conditions as the public convenience and necessity may require." Id.

The other federal statute relevant to this appeal, the CZMA, provides grants of money to states that adopt federally approved coastal-management programs. See generally 16 U.S.C. § 1455. Among other requirements, a coastal-management program must define the "permissible land uses and water uses" and promulgate "[b]road guidelines on priorities of uses" within the state's coastal zones. Id. § 1455(d)(2). The CZMA limits FERC's certificate-granting authority in at least one important way: It prohibits FERC from granting a permit to conduct an activity that will affect "any land or water use or natural resource of the

coastal zone" until the state concurs with an applicant's determination that the proposed activity "complies with the enforceable policies of the state's approved [coastal-management program]." Id. § 1456(c)(3)(A). The Massachusetts Office of Coastal Zone Management ("Massachusetts OCZM") administers the Commonwealth's CZMA program.

Two local laws also bear on this dispute. The Massachusetts Wetlands Protection Act ("Massachusetts WPA") provides performance standards for construction activities in wetlands areas. See Mass. Gen. Laws ch. 131, § 40.[1] The Act "sets forth minimum standards only, 'leaving local communities free to adopt more stringent controls.'" Lovequist v. Conservation Comm'n of Dennis, 393 N.E.2d 858, 863 (Mass. 1979) (quoting Golden v. Selectmen of Falmouth, 265 N.E.2d 573, 577 (Mass. 1970)). It also requires a developer to file a notice of intention with and obtain an order of conditions from the municipality in which the construction is to be located prior to commencing construction. Mass. Gen. Laws ch. 131, § 40. Finally, the Weymouth Wetlands Protection Ordinance ("Weymouth WPO") generally requires a developer to obtain a permit from the Weymouth Conservation Commission before construction can begin in a wetlands area.

---

[1] Algonquin does not claim in this action that the statewide, minimum requirements of the Massachusetts WPA are preempted as applied to the compressor station.

- 4 -

Weymouth, Mass., Code § 7-301(b).  The Weymouth WPO gives the Conservation Commission the authority to impose permit conditions or deny an application in its entirety if it finds the project will not meet Conservation Commission performance standards or regulations.  Id. § 7-301(k).

**B.**

Algonquin is a natural-gas transmission company that is headquartered in Houston, Texas.  In response to rising demand for natural gas, Algonquin's proposed "Atlantic Bridge Project" aims to increase the delivery capacity of its existing natural-gas transmission system in the northeastern United States.  Algonquin seeks to construct a new compressor station -- an appurtenance that is placed alongside a gas pipeline to maintain pressure and gas-flow rates -- in Weymouth, Massachusetts as part of this project.  The proposed site is located within and adjacent to a wetlands area.  It is also situated in a coastal zone subject to Massachusetts' coastal-management program.

In October 2015, Algonquin applied to FERC for a CPCN to construct and operate the Atlantic Bridge Project.  FERC completed an environmental assessment of the proposed project pursuant to the National Environmental Policy Act ("NEPA"), see generally 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.4, in which it found that the proposal would have no significant environmental impact.  Subsequently, on January 25, 2017, FERC issued Algonquin the CPCN.

- 5 -

See Algonquin Gas Transmission, LLC Mars. & Ne. Pipeline, LLC (Algonquin), 158 FERC ¶ 61,061, 2017 WL 383829, at *1 (Jan. 25, 2017). Significant to this appeal, FERC's CPCN requires that Algonquin obtain a "determination of consistency with the [CZMA]" from Massachusetts OCZM "[p]rior to construction of the Weymouth Compressor Station." Id. at *64.

By the time Algonquin received the CPCN from FERC, it had already applied for several Commonwealth authorizations needed to obtain a determination of consistency from Massachusetts OCZM. Pursuant to the Massachusetts WPA and the Weymouth WPO, Algonquin sought authorization from the Weymouth Conservation Commission to begin construction. The Conservation Commission denied Algonquin's WPA and WPO permit applications. It found that Algonquin had not sufficiently addressed hurricane and explosion risks associated with the project. It also concluded that a Weymouth WPO permit could not be adequately conditioned to sufficiently mitigate the air, water, aesthetic, and recreational impairments that would result from construction and operation of the facility.

MassDEP has ultimate authority over Algonquin's WPA application, so Algonquin appealed Weymouth's WPA denial to MassDEP, seeking a superseding order of conditions. In a series of rulings and orders, MassDEP agreed with Algonquin and reversed the Massachusetts WPA permit denial. But Weymouth

- 6 -

administratively appealed that reversal, pursuant to 310 Mass. Code Regs. § 10.05(7)(j)(2), and MassDEP stayed the adjudication of Weymouth's appeal (and thus the finalization of the WPA authorization) until a court determines whether federal law preempts Weymouth's denial of the project under the Weymouth WPO. Massachusetts OCZM has yet to issue a consistency determination for the proposed project and maintains that it cannot do so until Algonquin proffers all relevant Commonwealth authorizations, including a final Massachusetts WPA permit.[2]

To summarize:  FERC has concluded its proceedings and has issued Algonquin a permit that is conditioned on receipt of a CZMA consistency determination from Massachusetts OCZM; Massachusetts OCZM will not issue its determination until MassDEP conclusively rules in favor of Algonquin on Weymouth's challenge to the Massachusetts WPA approval; and MassDEP will not dispose of that challenge until a court (or FERC) resolves Algonquin's preemption challenge to the application of Weymouth's ordinance to the compressor station.

Thus matters stood on May 4, 2017, when Algonquin commenced this action in federal district court against the Town

---

[2] Weymouth holds the position that MassDEP's stay is not an impediment to Algonquin's receipt of a consistency determination from Massachusetts OCZM.  However, as will be addressed, infra, Massachusetts OCZM appears to require the submission of a final Massachusetts WPA permit, when applicable, before completing its CZMA review.

of Weymouth and the Weymouth Conservation Commission (collectively "Weymouth"), seeking a declaratory judgment that the construction and operation of the Weymouth Compressor Station is not subject to the Weymouth WPO and enjoining enforcement of the permit denial because the ordinance, as it applies to the compressor station, is preempted under federal law. The district court entered summary judgment for Algonquin, relying on both field preemption and conflict preemption grounds in doing so. Algonquin Gas Transmission, LLC v. Weymouth Conservation Comm'n, No. 17-10788-DJC, 2017 WL 6757544, at *5-7 (D. Mass. Dec. 29, 2017). Weymouth's appeal followed.

## II.

Weymouth advances two reasons why we should reverse the district court's entry of summary judgment for Algonquin. First, it argues that the district court erred in not finding this action to be time-barred. Second, as to the merits, Weymouth argues that application of its ordinance to the proposed compressor station is not foreclosed by federal law under theories of conflict and field preemption. We consider each argument in turn.

### A.

When a federal statute creates a cause of action for damages or other legal relief but provides no applicable statute of limitations, "we generally 'borrow' the most closely analogous state limitations period." Graham Cty. Soil & Water Conservation

- 8 -

Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 414 (2005) (citing N. Star Steel Co. v. Thomas, 515 U.S. 29, 33-34 (1995)); see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 147 (1987) (observing that "the Rules of Decision Act, 28 U.S.C. § 1652, requires application of state statutes of limitations unless 'a timeliness rule drawn from elsewhere in federal law should be applied.'" (quoting DelCostello v. Teamsters, 462 U.S. 151, 159 n.13 (1983))). Weymouth urges us to apply this general rule to Algonquin's preemption claim and to look to Massachusetts' certiorari statute, Mass. Gen. Laws ch. 249, § 4, for the applicable statute of limitations. The certiorari statute provides sixty days to correct errors in a judicial or quasi-judicial proceeding that is not otherwise reviewable. See id.; City of Revere v. Mass. Gaming Comm'n, 71 N.E.3d 457, 467 (Mass. 2017). Were we to adopt Weymouth's position, Algonquin's preemption claim would be time-barred because Algonquin filed this action in May 2017 -- nearly a year after the Conservation Commission's WPO permit denial.

This general borrowing rule upon which Weymouth relies has an important exception. In equitable suits arising under federal law, we normally do not borrow a limitations period from state law. See Holmberg v. Armbrecht, 327 U.S. 392, 395-96 (1946) ("Traditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief."); Russell v. Todd,

309 U.S. 280, 287 (1940) ("The Rules of Decision Act does not apply to suits in equity."); Union Carbide Corp. v. State Bd. of Tax Comm'rs, 992 F.2d 119, 122-23 (7th Cir. 1993); see also Reed v. United Transp. Union, 488 U.S. 319, 324 (1989) (citing Holmberg with approval).  Instead, the doctrine of laches applies.  See Russell, 309 U.S. at 287.

This exception for equitable actions is subject to one caveat:  Sometimes a claim for equitable relief is pursued to vindicate a legal right.  For example, federal law may create a legal right subject to enforcement at both law (for damages) and equity.  In such a case, the limitations period applicable to the claim at law may be applied to the equitable claim as well.  See Cope v. Anderson, 331 U.S. 461, 464 (1947) ("[E]quity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy."); Russell, 309 U.S. at 289.  Algonquin, however, brings no equitable sibling of a concurrent claim at law.  Rather, it solely pursues a freestanding federal equitable claim unassociated with any concurrent federal legal remedy that might supply (either directly or by borrowing) any limitations period.

Weymouth's briefs nevertheless seem to argue by implication that the Massachusetts certiorari statue is the applicable concurrent legal remedy to which we should look.  However, we have found no case holding that a state legal remedy

is the concurrent remedy at law for an equitable claim brought under <u>federal</u> law, and for good reason: Such a holding would run counter to the principle that claims are "concurrent" when "the only difference between [them] is the relief sought." <u>Grynberg</u> v. <u>Total S.A.</u>, 538 F.3d 1336, 1353 (10th Cir. 2008). Moreover, the very purpose of the concurrent-legal-remedy doctrine is "[t]o prevent plaintiffs from making a mockery of the statute of limitations by the simple expedient of creative labelling." <u>Gilbert</u> v. <u>City of Cambridge</u>, 932 F.2d 51, 57 (1st Cir. 1991). Filing a well-recognized federal claim rather than a state-law claim cannot be fairly described as claim relabeling; rather, it is the selection of one claim instead of another within the context of a dual-sovereign system.

That Algonquin also requests declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, does not vitiate the equitable nature of its suit. To "ascertain whether a particular suit for declaratory relief is grounded in law or in equity," we ask "whether, in the absence of the Declaratory Judgment Act, the suit brought would have been legal or equitable in nature." <u>El Dia, Inc.</u> v. <u>Hernandez Colon</u>, 963 F.2d 488, 493 (1st Cir. 1992) (quoting <u>Mowbray</u> v. <u>Moseley, Hallgarten, Estabrook & Weeden, Inc.</u>, 795 F.2d 1111, 1114–15 (1st Cir. 1986)). Were declaratory relief unavailable to Algonquin, Algonquin would be left to pursue its negative injunction, premised on its claim that

federal law "immunizes" it from local regulation, see Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. 1378, 1384 (2015), as its only federal means of redress. For this reason, Algonquin's requested declaratory relief is also grounded in equity. Hence, we apply laches.

Laches arguably might have barred Algonquin's preemption claim if Weymouth had shown that Algonquin lacked reasonable diligence in pursuing its federal rights to Weymouth's prejudice. See K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989) (citing Puerto Rican–Am. Ins. Co. v. Benjamin Shipping Co., 829 F.2d 281, 283 (1st Cir. 1987)). However, Weymouth has made no argument on appeal that laches should foreclose our consideration of Algonquin's suit. And though Weymouth maintains that Algonquin could have raised its preemption claim sooner, it does not contend that Algonquin's delay was unreasonable or that it prejudiced Weymouth in any way. Thus, we deem this argument waived. See Rife v. One W. Bank, F.S.B., 873 F.3d 17, 19 (1st Cir. 2017) ("It is well-settled that arguments not raised in an opening brief . . . are deemed waived."). And even were it not waived, nothing in the record before us indicates a lack of diligence on Algonquin's part or any prejudice to Weymouth.

Accordingly, we affirm the district court's finding that Algonquin's preemption claim is not time-barred.

**B.**

The district court relied on field preemption and conflict preemption principles in entering summary judgment for Algonquin. See Algonquin Gas Transmission, LLC, 2017 WL 6757544, at *5-7. Weymouth maintains that neither form of preemption should preclude the application of its ordinance to the Weymouth Compressor Station. Before we reach the merits of this issue, however, we first consider whether Algonquin's preemption claim is ripe for our review.

**1.**

"[T]he question of ripeness may be considered on a court's own motion." Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003). We do so now and, after careful consideration, we find Algonquin's preemption claim ripe for judicial resolution.

In determining whether an issue is ripe for our review, we consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Id. (citing Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). The fitness prong of this inquiry implicates both constitutional and prudential justiciability concerns. See McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 70 (1st Cir. 2003); 13B Charles Alan Wright et al., Federal Practice and Procedure § 3532.1 (3d ed. 2018). Article III principles require us first

to ask "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all," thus rendering any opinion we might offer advisory. Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995) (quoting Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992) (per curiam)); see also Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013). The prudential component of the fitness test asks whether resolution of the case turns on "legal issues not likely to be significantly affected by further factual development." Ernst & Young, 45 F.3d at 536. On the other hand, the hardship prong of this inquiry is purely prudential and requires that we evaluate "whether the challenged action creates a 'direct and immediate' dilemma for the parties." W.R. Grace & Co.–Conn. v. EPA, 959 F.2d 360, 364 (1st Cir. 1992) (quoting Abbot Labs., 387 U.S. at 152–53).

In City of Fall River, Massachusetts v. FERC, we found a challenge to a FERC permit not ripe when the permit made the commencement of construction contingent on the receipt of authorizations from two other federal agencies. 507 F.3d 1, 4–5, 7–8 (1st Cir. 2007). In that case, it was uncertain whether the approved work would be forthcoming because both agencies had withheld approval and "ha[d] expressed serious reservations about the project." Id. at 7. Thus, we found it likely that our

- 14 -

resolution of the challenge to FERC's conditional approval "would be advisory" and "irrelevant to the ultimate approvability of the project." Id. at 8.

In this case, FERC's certificate also makes construction contingent upon the approval of another agency. See Algonquin, 2017 WL 383829, at *64 ("Prior to construction of the Weymouth Compressor Station, Algonquin shall file with the Secretary a copy of [Massachusetts OCZM's] determination of consistency with the Coastal Zone Management Act."). Unlike Fall River, however, this case does not involve a challenge to the conditioned permit itself. Rather, Algonquin seeks relief that would finally remove a principal impediment that stands in the way of a final action by that other agency.[3] Moreover, Massachusetts OCZM has expressed no serious reservation about issuing a determination of consistency -- at least as far as we can tell based on the record before us -- and MassDEP's initial decision to grant Algonquin a Massachusetts

_____

[3] Weymouth disputes that the stay of its challenge to MassDEP's superseding order of conditions is an impediment to Algonquin's receipt of a consistency determination from Massachusetts OCZM. However, Massachusetts OCZM maintains that it "cannot complete its review and issue a decision of consistency with its enforceable program policies until all applicable licenses, permits, certifications and other authorizations have been issued by Massachusetts environmental agencies." And it is not contested that the Massachusetts WPA is such an enforceable policy under Massachusetts' coastal-management program. It follows that MassDEP must complete its adjudication of Weymouth's challenge before Massachusetts OCZM will complete its CZMA review.

WPA permit indicates that a final disposition in Algonquin's favor is, while not preordained, at least likely. Accordingly, our resolution of Algonquin's preemption claim would be neither "advisory" nor "irrelevant"; rather, it would apparently clear a procedural logjam that would not otherwise be cleared. See Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 468-69 (1st Cir. 2009) (finding the final resolution of "barriers to ultimate approval of the project" sufficient to warrant our exercise of jurisdiction).

For these reasons, we find Algonquin's challenge to be ripe.

**2.**

Algonquin urges us to hold, in accordance with the district court's decision, that the NGA itself preempts the field of regulation that includes any material application of the Weymouth WPO to Algonquin's Atlantic Bridge Project. We decline to go so far, preferring to decide the preemption issue on narrower grounds, that of conflict preemption. See Weaver's Cove Energy, LLC, 589 F.3d at 472. Conflict preemption exists when "'compliance with both state and federal law is impossible,' or where 'the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."'" Oneok, Inc. v. Learjet, Inc., 135 S. Ct. 1591, 1595 (2015) (quoting California v. ARC Am. Corp., 490 U.S. 93, 100, 101 (1989)). We review the

- 16 -

district court's preemption decision de novo.  Weaver's Cove Energy, LLC, 589 F.3d at 472.

Though the NGA itself does not expressly provide for a comprehensive regulatory scheme pursuant to which FERC must consider environmental, siting, and safety factors when issuing a CPCN, FERC's regulations implementing that statute do provide such a scheme.  Prior to authorization, FERC is required to prepare an environmental assessment under NEPA, 18 C.F.R. § 380.5(b)(1); see also 42 U.S.C. § 4332; 40 C.F.R. § 1508.9.  An environmental assessment must discuss "the need for the proposal, . . . alternatives [to the project], . . . [and] the environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9(b).  In addition, an environmental assessment must include an analysis determining whether a full-blown environmental impact statement must be prepared and whether the project will have a significant environmental impact. Id. § 1508.9(a)(1).  This process entails FERC taking a close look at the "intensity" of the project's environmental consequences, including "[t]he degree to which the proposed action affects public health or safety," "proximity to . . . wetlands," the extent to which "the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b).

- 17 -

In addition, FERC's regulations require a developer to include in its application for a CPCN "all information necessary to advise [FERC] fully concerning the . . . construction . . . for which a certificate is requested." 18 C.F.R. § 157.5(a). This includes information detailing the location and size of a proposed facility and environmental reports detailing the projected local and environmental consequences of the project. See 18 C.F.R. § 157.14(a)(6)–(7). Specifically, these environmental reports must identify the wetlands that will be affected and available mitigation measures, id. § 380.12(d)–(e), the land use, public health, safety, and aesthetic consequences of the project, id. § 380.12(j), and any air quality impacts the proposal might have, id. § 380.12(k). Then, pursuant to FERC's Certificate Policy Statement, FERC determines whether a project is in the public convenience and necessity by "balanc[ing] the public benefits against the potential adverse consequences." Certification of New Interstate Nat. Gas Pipeline Facilities, 88 FERC ¶ 61,227, 61,745 (1999), clarified, 90 FERC ¶ 61,128 (2000), further clarified, 92 FERC ¶ 61,094 (2000). This balancing weighs the economic vitality of the project and any adverse effects on existing customers before proceeding to "an independent environmental review" of the project, whereby FERC considers the NEPA analysis, "the other interests of landowners and the surrounding community," potential "route[s] other than the one proposed by the applicant," and the

goal of avoiding "unnecessary disruptions of the environment." Id. ¶¶ 61,737; 61,745; 61,749.

Pursuant to this process, FERC -- in both its environmental assessment and its CPCN -- considered essentially the same environmental and safety concerns that the Conservation Commission relied upon in denying Algonquin a Weymouth WPO permit. FERC's environmental analysis addressed water resources, wetlands, land use, recreational, air quality, and safety considerations associated with the Atlantic Bridge Project and the Weymouth Compressor Station. See Algonquin, 2017 WL 383829, at *10. And in its CPCN, FERC specifically addressed environmental justice, aesthetic, and air quality concerns regarding the siting of the compressor station but found such impacts either not significant or adequately addressable. Id. at *23–24, 37–39. The CPCN also considered risks from flooding and impacts from hurricanes but concluded that the station's proposed design would minimize these risks. Id. at *26–27. It further concluded that the project would have no direct impact on water resources or nearby wetlands since no dredging or in-water construction at the Weymouth site would be required. Id. at *30–34. Finally, as to risks from a potential explosion, FERC's CPCN noted that Algonquin has committed to comply with all applicable Pipeline and Hazardous Materials Safety Administration regulations, thereby minimizing any such risk. Id. at *53.

Based on its economic and environmental review, and its finding that there was no better site for the Weymouth Compressor Station, id. at *26, FERC concluded that its construction and operation would serve the public interest, id. at *5-6. The Conservation Commission's order reaches the opposite conclusion based on essentially the same environmental considerations. In so doing, the Conservation Commission's permit denial certainly poses a significant obstacle, indeed an effectively complete obstacle, to FERC's ultimate determination that "public convenience and necessity" "require" that the Weymouth Compressor Station be built. 15 U.S.C. § 717f(e) (emphasis added). Accordingly, FERC's issuance of a CPCN to Algonquin in this case conflict preempts the Conservation Commission's WPO permit denial. See Oneok, Inc., 135 S. Ct. at 1595.

Weymouth seeks to avoid this result by arguing that Algonquin breached a duty to "make a reasonable attempt to obtain an approval before asserting that the local authority has 'prohibited' the project." Weymouth provides no support for the existence of such a duty under federal law. To the extent that Weymouth makes this argument in reliance on the portion of FERC's certificate that "encourages cooperation between interstate pipelines and local authorities," Algonquin, 2017 WL 383829, at *12, we note that this provision does not require such cooperation from Algonquin; it merely "encourages" it, perhaps to

- 20 -

the satisfaction of FERC.[4]  But nothing in the FERC certificate or any federal law to which Weymouth points would allow us to forgo our preemption ruling on the basis that Algonquin did not try hard enough to convince Weymouth to allow the project to proceed.

Weymouth also passingly invokes the doctrine of unclean hands to suggest that we should decline to grant the declaratory and injunctive relief that Algonquin seeks in this case.  See generally Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995).  But even assuming (without deciding) that Algonquin somehow owed an enforceable duty to Weymouth to seek Weymouth's approval of the project under its ordinance, Weymouth points to no evidence in the record to support its proposition that Algonquin pursued a WPO permit in less than good faith.[5]

Weymouth also argues that FERC's CPCN cannot have preemptive effect in this case due to its "conditional" nature. We reject this argument for essentially the same reasons we found this dispute to be ripe.  FERC has conclusively and finally weighed

---

[4] If Weymouth means to raise a lack of cooperation as a collateral challenge to Algonquin's compliance with FERC's certificate, that issue is not before us.

[5] On this point, Weymouth argues that entry of summary judgment for Algonquin would be inappropriate before discovery has been conducted.  Weymouth, though, did not move to defer the district court's consideration of the summary judgment motion to allow for discovery pursuant to Fed. R. Civ. P. 56(d).

the environmental, safety, and siting considerations associated with this project in its CPCN, and FERC's determination that the project is necessary and in the public interest is at this point only "conditional" in that it awaits the conclusion of MassDEP's proceeding and a consistency determination from Massachusetts OCZM, both of which, in turn, hinge on our preemption decision. Whether and to what extent the FERC permit is otherwise conditioned we need not decide. Likely for similar, albeit unstated reasons, we have, in at least one instance, readily assumed that FERC approvals containing similar conditions precedent still have preemptive force. See Weaver's Cove Energy, LLC, 589 F.3d at 472-474.[6] And the D.C. Circuit has applied this same assumption. See, e.g., Myersville Citizens for a Rural Cmty., Inc. v. FERC, 783 F.3d 1301, 1308, 1319-22 (D.C. Cir. 2015); Dominion Transmission, Inc. v. Summers, 723 F.3d 238, 245 (D.C. Cir. 2013). On the other side of the ledger, Weymouth directs us to no case holding that such a FERC authorization -- final in all respects aside from

---

[6] Weymouth argues that Weaver's Cove is inapposite because concurrence with the state's coastal-management program could be presumed for the court's preemption analysis there. This ignores the fact that the Weaver's Cove project required additional authorizations before construction could commence, including one from the Army Corps of Engineers under the Rivers and Harbors Act, 33 U.S.C. § 403, which Weaver's Cove had not yet obtained at the time of appeal. See Weaver's Cove Energy, LLC, 589 F.3d at 463, 468. Our decision in that case also noted an amendment to the original plan that required additional "federal regulatory approval" before construction could begin. See id. at 468.

requiring the applicant to obtain additional approvals prior to commencing construction -- lacks the ability to preempt contrary state or local law.

With these considerations in mind, we hold that FERC's CPCN conflict preempts the Conservation Commission's WPO permit denial.

### III.

For the foregoing reasons, we <u>affirm</u> the district court's entry of summary judgment for Algonquin to the extent that it held that FERC's issuance of a CPCN authorizing construction of the Weymouth Compressor Station conflict preempts Weymouth's application of its ordinance to Algonquin's FERC-approved project.