W.R. GRACE & CO.—CONN., Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

No. 91–1601.

United States Court of Appeals, First Circuit.

Heard Dec. 4, 1991.

Decided March 23, 1992.

---

361

Angus Macbeth with whom Christopher L. Bell, Robin M. Richardson, Sidley & Austin, Washington, D.C., and Roderic J. McLaren, Cambridge, Mass., were on brief, for petitioner.

Craig D. Galli with whom Barry M. Hartman, Acting Asst. Atty. Gen., Caroline H. Wehling, Washington, D.C., and Margery L. Adams, Brookline, Mass., were on brief for respondent.

James R. Bieke, John Townsend Rich and Shea & Gardner, Washington, D.C., on brief for General Elec. Co., amicus curiae.

John R. Quarles, Jr., Lowell F. Martin, Alex S. Karlin, and Morgan, Lewis & Bockius, Washington, D.C., on brief for the RCRA Corrective Action Project, the Chemical Mfrs. Ass'n, the American Petroleum Institute, and the National Ass'n of Mfrs., amici curiae.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and POLLAK,* Senior District Judge.

COFFIN, Senior Circuit Judge.

Petitioner, W.R. Grace & Co. ("Grace" or "the company"), received from respondent, the Environmental Protection Agency ("EPA" or "the agency"), a corrective action permit under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–92k. Grace petitioned the Administrator of EPA for review of the permit, claiming that certain of its provisions violated RCRA, EPA regulations, and the Due Process Clause of the Fifth Amendment of the United States Constitution. The Administrator denied the petition. Grace seeks review of that decision in this court, reiterating its statutory and constitutional arguments. Because we find these claims unripe at this time, we do not reach their merits and dismiss that portion of Grace's petition devoted to them.[1]

## I. Background

RCRA regulates facilities that treat, store, or dispose of hazardous materials ("TSD facilities"). As a condition of operation, TSD facilities must obtain from EPA a "TSD Permit." RCRA § 3005(a), 42 U.S.C. § 6925(a). The Hazardous and Solid Waste Amendments to RCRA, enacted in 1984, require TSD permits to prescribe "corrective action," or cleanup, for "releases of hazardous waste or constituents" detected at TSD facilities. RCRA § 3004(u), 42 U.S.C. § 6924(u). Where EPA detects such releases *after* issuing the TSD permit—or suspects their existence—it may issue the owner or operator of the facility a separate "corrective action" permit. *See id.* and RCRA § 3005, 42 U.S.C. § 6925. The corrective action permit will direct the permittee to conduct a series of investigations in accordance with a "schedule[ ] of compliance," RCRA § 3004(u), 42 U.S.C. § 6924(u), to determine whether any hazardous release exists at the facility.

Grace, a major manufacturer of chemicals for industrial use, received a TSD permit in 1985. Between 1988 and 1989, EPA

---

* Of the Eastern District of Pennsylvania, sitting by designation.

1. Grace also argues to us, as it did to the EPA Administrator, that certain deadlines contained in the permit are "arbitrary ... capricious ... an abuse of discretion," and therefore unlawful under the Administrative Procedure Act ("the APA"), 5 U.S.C. § 706(2)(A). Grace requests that we remand its permit with directions to EPA to set new time frames. We decline to do so. EPA is statutorily compelled to devise and impose "schedules of compliance" for corrective action, such as those contained in Grace's permit. RCRA § 3004(u), 42 U.S.C. § 6924(u). The agency asserts that the objectionable time frames are neither arbitrary nor capricious, adverting to its expertise in the management of corrective action programs—and Grace has offered nothing to persuade us otherwise. We note, as well, that none of the challenged deadlines has yet become due. Based on EPA's representations *infra* at 366, we expect that Grace will be able to request an extension of any due date, should this become necessary. We therefore deny this portion of Grace's petition.

detected releases of potentially hazardous waste or constituents at Grace's Nashua, New Hampshire facility. In September 1989, the agency issued Grace a corrective action permit, requiring the company to investigate and, if necessary, remedy the releases.

The permit instructs Grace, pursuant to a schedule of compliance, to submit to EPA a series of proposals and studies characterizing the nature and extent of any suspect release. For example, Grace must supply EPA with a "RCRA Facility Investigation (RFI) Proposal" within three months of the permit's issuance. Over the next twenty-four or so months, Grace is to provide EPA with approximately four more major submissions, the due dates of which are staggered to allow the results of earlier studies to inform subsequent work.

If a hazardous release is detected, Grace will be required to provide EPA with a range of cleanup proposals, in the form of a "Corrective Measures Study (CMS) Proposal." Within three months of EPA's approval of the proposal, Grace will have to submit a CMS Report, which will include the company's own recommendations for corrective measures. EPA then will select a remedial plan to be implemented by Grace and revise Grace's corrective action permit to include the cleanup measures.[2]

The administrator of the EPA regional office charged with oversight of Grace's Nashua facility ("the Regional Administrator") issued a "draft permit" to Grace, for public comment, before issuing the final permit. The draft permit set forth the procedure by which EPA intends to review the proposals, reports, and studies submitted by Grace during the investigative phase of its corrective action program.

When EPA approves a submission—a proposal regarding the number and placement of sampling wells necessary for a particular study, for example—the approved specifications will become an enforceable part of the permit and binding upon Grace. EPA may, however, reject a Grace submission as deficient, and, over Grace's objection, revise the particular proposal to conform to EPA's assessment of what corrective action requires.[3] In such a case, EPA's recommendations, rather than those submitted by Grace, become enforceable permit conditions.[4]

In a set of written comments upon the draft, Grace strenuously objected to this modification procedure, arguing that under RCRA and applicable regulations, as well as the Due Process Clause of the Fifth Amendment, it was entitled to impartial review of such unilateral agency action. Grace argued to the Regional Administrator, as it does before us, that investigative phase tasks can be extremely costly and that, where Grace and EPA disagree as to how a particular study ought to be conducted—whether five or fifty sampling wells ought to be drilled to determine a particular constituent level, for example—Grace is entitled to judicial and/or administrative review.

The Regional Administrator rejected Grace's claims in a published statement and issued the final version of the corrective action permit with the modification provisions intact. Grace then petitioned the EPA Administrator for review of the Regional Administrator's action. In an opinion and order dated March 25, 1991, the EPA Administrator denied Grace's petition, upholding the Regional Administrator's construction of RCRA, the regulations, and

2. The schedule of compliance allows twenty-eight months for completion of both the investigative and remedial phases of the corrective action program, excluding time for EPA review of Grace's submissions.

3. Before EPA revises a submission, it will ask Grace to submit a modified version addressing the deficiencies noted by the agency. If EPA remains dissatisfied with Grace's recommendations, it will then amend the document itself, over the company's objections, if necessary.

4. Grace's permit states that "[i]f ... [the company's RFI] Proposal is not approved, the ... [Regional Administrator] may ... either require further modification or make such modifications as he deems necessary.... In the event that the [Regional Administrator] makes such modifications, the modified Proposal becomes the approved RFI Proposal." The same procedure governs the other submissions required under the permit.

the Due Process Clause.[5] Grace, supported by amici,[6] seeks review of that decision before us.[7]

## II. Discussion

We discuss only so much of the parties' arguments as is necessary to provide context and support for our decision.

### A. Unreviewable Revision or Reviewable "Modification"?

#### 1. *The Statutory Claim*

Under RCRA and the applicable regulations, a permittee is entitled to administrative and judicial review of certain sorts of EPA action taken with regard to RCRA permits. A permittee may petition the EPA Administrator for review of the agency's decision "to issue, deny, *modify*, revoke and reissue, or terminate a permit." 40 C.F.R. §§ 124.15(a) (emphasis added), 124.19(a).[8] Review of the Administrator's decision is available in the federal courts of appeals. RCRA § 7006(b), 42 U.S.C. § 6976(b); *see also* note 7 *supra*. The procedures by, and conditions under, which EPA may modify a RCRA permit are set forth in 40 C.F.R. § 270.41.

The nub of Grace's complaint is that when EPA revises one of Grace's investigative phase submissions, it "modifies" Grace's permit within the meaning of these provisions, triggering Grace's right to administrative and judicial review. EPA takes the position that revisions of a permittee's investigative phase submissions are not "modifications" under the statute

and regulations and therefore implicate no such rights.

Permit "modification" entitling a permittee to administrative and judicial review, the agency contends, denotes one of two discrete sorts of EPA action. The agency "modifies" a corrective action permit when, at the conclusion of the investigative phase, it selects appropriate corrective measures and incorporates them into the permit. Under the agency's interpretation of RCRA and the regulations, therefore, its revision of a permittee's *investigative* phase reports and recommendations—which the agency carefully characterizes as "interim" submissions—generally does not "modify" the permit.

According to the agency, permit "modification" does occur, however, when the agency approves an investigative submission, but subsequently changes its position.[9] Thus, under EPA's view, when the agency seeks to alter an already approved "interim" submission, over a permittee's objection—where, for example, EPA and the permittee have agreed that fifty sampling wells ought to be drilled to satisfy a particular investigative study, but EPA later decides that fifty-one wells are necessary—the permittee presumably is entitled to administrative and judicial review of the proposed revision.

#### 2. *The Constitutional Claim*

Grace also contends that the modification procedure contained in its permit denies the company due process under the Fifth Amendment. By Grace's lights, its permit, as issued, allows the agency to impose new

**5.** The Administrator also rejected Grace's claim that certain time frames set forth in the draft permit were unlawful. *See supra* note 1.

**6.** The General Electric Company, the RCRA Corrective Action Project, the Chemical Manufacturers Association, the American Petroleum Institute, and the National Association of Manufacturers filed briefs in support of Grace's statutory and constitutional arguments on this appeal.

**7.** Our jurisdiction in this case is not disputed. Under RCRA § 7006(b), 42 U.S.C. § 6976(b), "[r]eview of the Administrator's action ... in *issuing*, denying, modifying, or revoking any

[RCRA permit] ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person transacts ... business." (Emphasis added.) Grace challenges the EPA Administrator's decision upholding permit provisions which, as issued, are alleged to violate RCRA and the Fifth Amendment.

**8.** Citations to the Code of Federal Regulations are to the 1990 edition, unless otherwise noted.

**9.** EPA mentions, but devotes little attention to this point in its brief. In characterizing the agency's position, we rely on representations made by EPA at oral argument.

and costly obligations upon Grace during the investigative phase of its corrective action program—forcing Grace to drill fifty sampling wells rather than five, for example—without any opportunity for pre-deprivation review by an impartial tribunal.

EPA counters with several arguments, two of which we mention here. Due process, the agency contends, is served by the availability of administrative and judicial review at the *conclusion* of the investigative phase, when EPA revises the permit to incorporate the remedial measures. In addition, according to EPA, the opportunities available to Grace to make known its views to the Regional Administrator and EPA staff informally *during* the investigative phase afford Grace adequate process under the Fifth Amendment.

### 3. *The Projected Stakes*

Affirmance of EPA's unilateral modification procedure, according to Grace, will force the company to expend resources— perhaps millions of dollars—complying with wrongheaded EPA directives during the investigative phase of its corrective action program. By the time Grace is entitled to review, under EPA's interpretation of RCRA and the regulations (when the agency selects and implements remedial measures for the Nashua facility), any challenge to the investigative phase expenditures, Grace fears, will be moot. The sampling wells will have been drilled, the chemists hired, and their investigations completed, for example. The money spent and the work done, EPA's revision of Grace's permit will escape meaningful review.

Alternatively, refusal to comply with EPA's investigative phase revisions, Grace argues, will subject the company to statutory penalties of $25,000 per day for violation of an EPA compliance order. *See* RCRA § 3008(a), (c), 42 U.S.C. § 6928(a), (c). In addition, non-compliance will expose the company to the risk of losing its TSD permit, and so to the possibility of having to shut down its Nashua facility. *See id.*

EPA, for its part, insists that Grace's construction of RCRA and the regulations, if adopted, will derail the cleanup of hazardous waste and so thwart the legislative purpose of RCRA. To grant a permittee like Grace the right to formal review whenever EPA revises an investigative phase submission—rather than requiring it to await EPA's implementation of remedial measures—would introduce unacceptable and uncontrollable delay in the corrective action process.

We do not reach the merits of these claims, concluding that Grace's challenge to the modification procedure in its permit is not yet ripe.

### B. Ripeness

 "The issue of ripeness turns on the 'fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir.1990) (quoting *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983)). Under the "fitness for review" inquiry, we consider whether the issue presented is purely legal, as opposed to factual, and the degree to which any challenged agency action is final. *See Abbott Lab. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1966); *Lujan v. National Wildlife Fed'n*, —— U.S. ——, 110 S.Ct. 3177, 3190–91, 111 L.Ed.2d 695 (1990). The "hardship to the parties" question, on the other hand, typically turns upon whether the challenged action creates a "direct and immediate" dilemma for the parties, requiring them to choose between costly compliance and noncompliance, at the risk of punishment. *Abbott Lab.*, 387 U.S. at 152–53, 87 S.Ct. at 1517–18; *National Wildlife Fed'n*, 110 S.Ct. at 3190. As this court recently has stated, "[p]erhaps the most important consideration in determining whether a claim is ripe for adjudication is the extent to which 'the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all.'" *Lincoln House, Inc.*, 903 F.2d at 847 (quoting 13A Wright & Miller, Federal

Practice and Procedure § 3532.2, at 141 (1984) [hereinafter Wright & Miller]).

 Under this framework, Grace's statutory and constitutional claims are plainly unripe. The company seeks a ruling from this court that it is entitled to judicial and/or administrative review whenever EPA revises one of Grace's investigative phase submissions over the company's objection. Yet EPA has not revised or rejected a single Grace submission.

Grace submitted its first RFI Proposal in December 1989. Since then, EPA and Grace have communicated extensively on the subject of its sufficiency. EPA expressed its disapproval of the proposal to Grace in a series of written comments. EPA and Grace staff then met to discuss EPA's comments and Grace's concerns regarding the scope of the RFI and the compliance schedule set forth in its permit. Grace submitted a revised RFI Proposal in February 1991. Following further telephone conversations, correspondence, and face-to-face meetings between EPA and Grace, EPA informed Grace in August 1991 that the revised submission was largely acceptable. Grace's final revisions are due shortly.[10]

It is uncontroverted that a dispute between Grace and EPA could arise only from EPA's rejection or revision of Grace's RFI Proposal or some subsequent submission, and Grace's refusal to comply. No such dispute has arisen. There is thus no "direct and immediate dilemma," nor any final agency action presently before us. Rather, Grace's petition depends entirely upon "'uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all.'" *Lincoln House, Inc.*, 903 F.2d at 847 (quoting Wright & Miller).

Grace, however, would have us recognize that in this case (1) the issue presented is a legal one and is as fully developed today as

it will be in the future; and (2) denying review at this time will cause the company intolerable harm under the "hardship to the parties" test of the ripeness doctrine. We find these contentions to be without merit.

### 1. *Sharpening of the Issues*

Our careful review of the parties' arguments convinces us that postponing decision on the merits until there exists an actual dispute between Grace and EPA is necessary to ensure fair, focused, and intelligent analysis of the issues presented.

While the suggestion that Grace's claims can be framed as purely legal ones is not entirely without force, we are not persuaded by it. Grace asks us to determine that RCRA, EPA regulations, and due process guarantee the company a right to judicial and/or administrative review whenever EPA unilaterally revises one of its submissions. Resolution of this "legal" question, though, will depend upon the factual context in which it arises. We suspect that the magnitude of any dispute between the parties—whether EPA requires the company to drill an additional five or five hundred sampling wells over Grace's objection, for example—will shape our judgment as to what the Constitution requires. The nature of any dispute between the parties will also affect our view of Grace's statutory claim. For no matter how deferential our review of the agency's interpretation of RCRA and the regulations, it will be influenced by any concerns we may have under the Due Process Clause. *See Reardon v. United States*, 947 F.2d 1509 (1st Cir.1991) (en banc).

Where, as here, the record is devoid of any dispute whatsoever, and there exists the possibility that none will ever arise between Grace and EPA, the prudential concerns underlying the ripeness doctrine counsel us to refrain from decision.[11] As

---

**10.** We draw our account of the specific exchanges between Grace and EPA to date from EPA's brief, noting that Grace contests none of the facts recited here.

**11.** We note a related obstacle to our decision. As it stands, Grace's argument admits of no

limitation. Whether EPA imposes an additional one hundred or one million dollars' worth of investigative work over Grace's objection, the agency presumably has "modified" Grace's permit. We asked Grace, at oral argument, to articulate a principle by which we might distin-

we have stated, "premature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort." *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1034, 1040 (1st Cir.1982). *See also Abbott Lab.*, 387 U.S. at 148–49, 87 S.Ct. at 1515–16. The dangers of such review would seem especially great in a case such as this where, according to both parties, any decision will spell doom for one or the other of them. *See* discussion *supra* Part II(A)(3).

As well, "[f]rom the agency's perspective, premature review not only can deprive the agency of the opportunity to refine, revise or clarify the . . . matter at issue, but it also can deprive it of the opportunity to resolve the underlying controversy on other grounds, thus . . . avoiding the need for court proceedings." *Roosevelt Campobello Int'l Park Comm'n*, 684 F.2d at 1040. In this vein, we note that EPA recently has proposed a series of regulations governing corrective action under RCRA,[12] at least one of which, if passed, would appear to lend some support to Grace's statutory interpretation.[13] Thus, depending upon the

fate of the proposed regulations, Grace's statutory claim may become moot before it ever ripens.[14]

### 2. *Hardship to Grace*

Grace also contends that postponing decision until we have before us an actual dispute will severely burden the company. Delay, Grace suggests, will subject it to the possibility of having to perform some disputed act required by EPA under impossibly tight deadlines. In addition, it will force Grace " 'as a practical matter, to comply with an agency ruling that it believes unlawful.' " (quoting *Roosevelt Campobello Int'l Park Comm'n*, 684 F.2d at 1040).

We are persuaded by neither argument. Nothing in RCRA or Grace's permit purports to bar Grace from requesting an extension of any deadline contained in its permit. Indeed, in its brief to us, EPA states unequivocally that, if additional time becomes necessary for the completion of an investigative phase task, Grace "can request a modification of the schedule of compliance . . . [pursuant to] 40 C.F.R. § 270.42."[15]

---

guish the substantial from the trivial "modification." The company was unable to do so.

**12.** *See* 55 Fed.Reg. 30,798 (1990) (proposed July 27, 1990).

**13.** To expedite corrective action while protecting the permittee's due process rights, EPA proposes that a class of "relatively routine" permit modifications be subject to judicial, but not administrative review. *See* Preamble to proposed 40 C.F.R. § 270.34(c), 55 Fed.Reg. 30,847–49. "Major" modifications—such as EPA's selection of cleanup measures once the investigative phase of a corrective action plan is complete—remain subject to both administrative and judicial review. *Id.* at 30,848. Minor modifications subject to the more streamlined review procedure, on the other hand, are those which alter the schedules of compliance contained in corrective action permits. *Id.* at 30,847. This class of permit revision arguably would embrace the sort of revisions at issue in Grace's petition, namely, agency alterations of investigative phase submissions. For example, agency revisions regarding "how many monitoring wells . . . need to be installed," *id.* at 30,849, "the appropriate soil sampling procedure[s]," *id.*, whether "to increase the frequency or methods used for ground-water sampling," *id.* at 30,848,

and other such "interim measures," *id.* at 30,-848, are "modifications" entitled to judicial review under the proposal. *Id.*

**14.** It is undisputed that since EPA has yet to take final action on these regulations, they do not control this appeal. We also note that we are in no position to offer any authoritative construction of them at this time. However, the EPA Administrator relied upon the draft regulations in its denial of Grace's administrative appeal, hailing them as the agency's "most comprehensive expression of its policies regarding corrective action." Moreover, EPA and Grace both urge us to weigh the proposed regulations in our review of the company's petition. We have done so for the limited purpose of bolstering our ripeness analysis.

**15.** Section 270.42, "Permit modification at the request of the permittee," sets forth the terms by which a permittee, such as Grace, may initiate revision of its permit. Where the agency denies a modification request, the permittee, depending upon the type of modification sought, may seek review of the agency's decision before the EPA Administrator. 40 C.F.R. §§ 270.42(f)(2), § 124.19. *See also* discussion *infra* at 367.

Grace's second claim is similarly lacking. As the company suggests, our decision to withhold review of Grace's petition at this time leaves open the possibility that Grace may one day be "put to the hardship of pursuing under pain of penalty a legal issue which it is now able to present to the court without such a burden." Yet the "hardship" to Grace occasioned by our delaying decision is purely speculative: if and when Grace refuses to comply with an EPA revision of one of its submissions, it may find itself defending a compliance order and incurring statutory penalties, daily, for the duration of its non-compliance. *See* discussion *supra* at 364. By the same token, of course, should EPA never actually revise or reject a submission over Grace's objection, Grace will not be so burdened.

As we view it, the "hardship to the parties" prong of the ripeness analysis is unconcerned with such wholly contingent harm. This would seem especially true where, as here, the hardship complained of is contingent upon the occurrence of precisely those events whose non-occurrence prompted the court's concerns about ripeness to begin with. Grace will endure no "pain of penalty" unless it disobeys an EPA compliance order. EPA will issue no such order, unless Grace refuses to comply with, or otherwise disputes, the agency's revision of one of its submissions. And no dispute will arise unless EPA actually revises or rejects one of Grace's submissions. Accordingly, delaying decision until such revision or rejection occurs, in our opinion, will work no relevant hardship upon Grace.

There being no concrete dispute between the parties, and Grace having failed to persuade us to proceed in spite of this, we decline to offer any opinion on the merits of Grace's petition at this time.

### III. Future Proceedings

Grace fears that in whatever manner it proceeds once its claims are ripe, EPA will argue that no permit "modification" has occurred, and, consequently, that neither the EPA Administrator, nor this court has jurisdiction to consider Grace's appeal. *See* 40 C.F.R. § 124.19, RCRA § 7006(b), 42 U.S.C. § 6976(b), discussed *supra* at 363; *and see* note 7 *supra.* Consequently, Grace requests that we indicate the appropriate forum for future proceedings in this case. Any resolution of this jurisdictional question, though, will require a decision on the merits of Grace's petition. As we have already explained, we are bound to withhold such decision at this time.

Various avenues of relief may be available to Grace once its claims are ripe. We mention those to which the parties and pleadings in this case have alerted us, but express no opinion as to their ultimate viability.

As EPA suggests, once a concrete dispute arises over EPA's revision of one of Grace's submissions, Grace presumably may petition this court for review, as it has done now once already. *See* RCRA § 7006(b), 42 U.S.C. § 6976(b). Alternatively, Grace may refuse to comply with EPA's terms, await an enforcement action by the agency, and raise its statutory and constitutional claims as defenses in the federal district court.[16] *See* RCRA § 3008(a), 42 U.S.C. § 6928(a) and discussion *supra* at 364.

Two more options may be available. On Grace's administrative appeal, EPA Region I (the regional office of EPA that issued Grace its corrective action permit), stated that Grace would be free to seek review of the agency's revision or rejection of its investigative phase submissions in the federal district court under the APA. *See* 5 U.S.C. § 702.[17] And at oral argument, when pressed by us, EPA suggested that Grace might seek relief under 40 C.F.R. § 270.42.[18]

---

16. We would expect Grace to seek a judicial stay of the penalty provisions of RCRA at that time, if necessary. *See* discussion *supra* at 364 & 367.

17. We note that EPA, in its brief to us, disagrees with the Region's position.

18. *See supra* note 15. After objecting to EPA's revision or rejection of one of its submissions, Grace presumably would request EPA to "modify" the permit to reflect the contents of the company's proposal. Judicial review of that decision, according to EPA, may be available in

Grace's claims concerning the modification provisions in its permit are *dismissed;* those pertaining to the deadlines, *see* note 1 *supra,* are *denied.* Costs to Respondent.

the federal district court under the APA. Neither party having briefed the issue fully, however, the applicability of § 270.42 to investigative phase submissions was not properly before us.