UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1024

DAVID AND CAROLYN GASKELL,

Plaintiffs, Appellants,

v.

THE HARVARD COOPERATIVE SOCIETY, ET AL.,

Defendants, Appellees.

No. 93-1102

DAVID AND CAROLYN GASKELL,

Plaintiffs, Appellees,

v.

THE HARVARD COOPERATIVE SOCIETY, ET AL.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Torruella, Oakes* and Cyr,

Circuit Judges.

*Of the Second Circuit, sitting by designation.

Norman H. Jackman with whom Martha M. Wishart and Jackman & Roth

were on brief for plaintiffs.
Francis J. Lawler with whom Robert M. Shea and Peabody & Brown

were on brief for defendants.

August 25, 1993

2

CYR, Circuit Judge. This case presents several impor-
CYR, Circuit Judge.

tant issues relating to group health plan "continuation coverage"

under the Employment Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. 1001 et seq., as amended by the Comprehen-

sive Omnibus Budget Reconciliation Act of 1985 ("COBRA"), P.L.

99-272, 100 Stat. 222 (1986). The district court ruled that

plaintiff Carolyn Gaskell, wife of "covered employee" David

Gaskell, was entitled to three years' continuation coverage under

COBRA, dating from her election of continuation coverage under an

ERISA employer-sponsored group health insurance plan. The court

denied a related subrogation claim brought by the Gaskells in the

name of their current insurer. The district court rejected

plaintiffs' requests for statutory penalties, punitive damages,

and attorney fees.

I

BACKGROUND

David Gaskell was a longtime employee of the Harvard

Cooperative Society ("Coop"), which provided Blue Cross group

medical plan coverage for its employees and their families. On

January 14, 1987, David went on full disability leave, during

which he received full salary and benefits, including Blue Cross

group plan coverage for himself and Carolyn, apparently at Coop

expense. More than a year later, on February 29, 1988, still

unable to work, David terminated his employment with the Coop,

3

retroactive to January 14, 1988.

Under COBRA, an employer that sponsors a group health

insurance plan must offer employees and "qualified beneficia-

ries," including spouses and dependent children, the opportunity

to continue their health insurance coverage, at group rates but

at their own expense, for at least eighteen months after the

occurrence of a "qualifying event" and notice to the affected

employee. See 29 U.S.C. 1161-68. A "qualifying event" in-

cludes a "termination . . . , or reduction of hours, of the

covered employee's employment" which, "but for the continuation

coverage under this part, would result in the loss of coverage of

a qualified beneficiary." Id. at 1163(2). In April 1988,

following David's resignation, the Coop sent a COBRA notice

informing him of his statutory right to continue his Blue Cross

group plan coverage for eighteen months, beginning July 1, 1988.

On April 26, 1988, David elected "continuation coverage" for

himself and Carolyn.

Within a year, the Gaskells learned that David would

become eligible for Medicare benefits beginning July 1, 1989.

Although Medicare eligibility would render David ineligible for

"continuation coverage" after July 1, 1989, see id. at 1162(2)

(D)(ii), it also would serve as a new "qualifying event," see id.

at 1163(4), and make Carolyn eligible for three years' "contin-

uation coverage" under the Coop group plan with Blue Cross. See

id. at 1162(2)(A)(ii). At about the same time, however, the

Gaskells learned that the Coop intended to terminate its Blue

4

Cross group plan and adopt a self-funded insurance plan adminis-

tered by Benefit Plans Northeast ("BPN"), effective July 1, 1989.

As the new BPN-administered plan would not be "convertible" to

individual coverage at the end of Carolyn's continuation coverage

period, the Gaskells decided to exercise their "conversion

option" under the Coop Blue Cross group plan. Accordingly, in

June 1989, prior to the changeover in Coop plan administration,

the Gaskells asked the Coop to "convert" Carolyn's group cover-

age, effective July 1, to individual direct-pay coverage under

the Blue Cross Managed Major Medical Plan.

The coincidence of David's Medicare eligibility,

Carolyn's application for conversion to an individual policy, and

the Coop's change to a self-funded plan, engendered considerable

confusion among the parties. On August 30, 1989, Blue Cross

began returning the Gaskells' medical bills unpaid. Blue Cross

contended that its obligation to provide Carolyn with individual

direct-pay coverage had terminated on June 30, 1989, concurrently

with the expiration of its group plan arrangement with the Coop,

and that any Blue Cross coverage beyond that date would be

available only on the terms imposed on new applicants, viz., a

240-day waiting period and an exclusion for preexisting medical

conditions. Finding these terms unacceptable, the Gaskells

sought to continue Carolyn's coverage under the Coop group plan,

then being administered by BPN. BPN refused, asserting that the

Coop's obligation to provide "continuation coverage" had termi-

nated before the change in plan administration took place on

5

July 1, 1989. After several unsuccessful efforts to obtain

satisfactory coverage, the Gaskells brought the present action

against the Coop, BPN, James Argeros (Coop president), Leonard

Cutler (BPN president), and Blue Cross, alleging violations of

COBRA and Massachusetts law.1

On January 31, 1991, the Gaskells settled their claims

against Blue Cross, in return for, inter alia, individual cover-

age for Carolyn under the Blue Cross Managed Major Medical Plan

retroactive to July 1, 1989. The retroactive coverage was

subject to a twenty percent co-payment. As part of the settle-

ment, Blue Cross assigned the Gaskells its subrogation rights

against the remaining defendants. The Gaskells then amended

their complaint to add a subrogation claim against the Coop and

BPN, relating to the eighty percent of Carolyn's medical expenses

which Blue Cross had paid under the terms of Carolyn's individual

Blue Cross policy.

On May 17, 1991, acting on cross-motions for judgment

on the pleadings, the district court ruled that BPN and the Coop

were legally responsible under COBRA for providing "continuation

coverage" of Carolyn's medical expenses between July 1, 1989 and

July 1, 1991. The court rejected the Gaskells' demand for

"extra-contractual" damages, and limited compensatory damages to

the twenty percent co-payment amount not retroactively covered by

Carolyn's individual Blue Cross policy, at the same time reserv-

1The Gaskells later waived their state-law claims against
all defendants.

6

ing decision on their subrogation claim for the remaining eighty

percent of Carolyn's medical expenses. See Gaskell v. Harvard

Cooperative Soc'y, 762 F. Supp. 1539, 1543-1544 & n.8 (D. Mass.

1991). Shortly thereafter, in an unpublished order, the district

court granted summary judgment against the Gaskells on their

subrogation claim, ruling that Blue Cross "possessed no rights

pursuant to the Subscriber Certificate against [the Coop] for

reimbursement of any monies paid towards [Carolyn's] medical

bills." The individual claims against Leonard Cutler, as "plan

administrator," were dismissed on October 6, 1992. The parties

stipulated to the dismissal of the remaining count against BPN,

and final judgment was entered on December 14, 1992. This appeal

followed.

II

DISCUSSION

Standards of Review

We review a grant of summary judgment de novo, employ-

ing the same criteria incumbent upon the district court. See

Vanhaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 3 (1st

Cir. 1993); High Voltage Eng'g Corp. v. Federal Ins. Co., 981

F.2d 596, 598 (1st Cir. 1992); Pedraza v. Shell Oil Co., 942 F.2d

48, 50 (1st Cir. 1991), cert. denied, 112 S.Ct. 993 (1992).

Summary judgment is appropriate where "the pleadings, deposi-

tions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

7

is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c); see Vanhaaren, 989 F.2d at 3; Canal Ins. Co. v. Benner,

980 F.2d 23, 25 (1st Cir. 1992). Similarly, on plenary review of

a district court judgment on the pleadings under Rule 12(c), all

material allegations in the complaint are credited in the light

most favorable to the plaintiff, see International Paper Co. v.

Jay, 928 F.2d 480, 482 (1st Cir. 1991). A dismissal on the

pleadings will be upheld only if "'it appears beyond doubt that

the plaintiff can prove no set of facts in support of [its]

claims which would entitle [it] to relief.'" Id. at 482-83

(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Statutory Background

COBRA was enacted in 1986, as a legislative response to

"reports of the growing number of Americans without any health

insurance coverage and the decreasing willingness of our Nation's

hospitals to provide care to those who cannot afford to pay,"

H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986

U.S.C.C.A.N. 579, 622.2 In "an effort to provide continued

2Although COBRA has been amended several times, see, e.g.,

Tax Reform Act of 1986, P.L. 99-514 (October 22, 1986), 1895-
(d); Technical and Miscellaneous Revenues Act of 1988, P.L. 100-
647 (November 10, 1988), 3011(a); and Omnibus Budget Reconcili-
ation Act of 1989 ("OBRA"), P.L. 101-239 (December 19, 1989),
6703-6710, 6801, 7862(c), 7891(d), except as otherwise indi-
cated we refer to the January, 1987 version as "COBRA."
For a fuller description of COBRA's enactment, see Thomas H.
Somers, COBRA: An Incremental Approach to National Health Insur-

ance, 5 J. Contemp. Health L. & Probs. 141, 141-2 (1992) (noting

that COBRA's "continuation coverage" provisions were enacted
"without deliberation . . . , in the process amending three
distinct statutes," and "invit[ing] a fair amount of regulatory
confusion.").

8

access to affordable private health insurance for some of these

individuals," H.R. Rep. No. 241, at 44, without increasing the

"staggering budget deficits now facing the United States," see S.

Rep. No. 146, 99th Cong., 2nd Sess. 3, reprinted in 1986 U.S.C.-

C.A.N. 42, 43, COBRA compels employers that sponsor certain group

health plans to provide "qualified beneficiaries" with the option

of receiving self-paid "continuation coverage," at no more than

102% of group rates, for eighteen or thirty-six months after the

occurrence of a "qualifying event" which would otherwise result

in a termination of coverage. See 29 U.S.C. 1161(a), 1162(2)-

(A).3

The "continuation coverage" required by COBRA must be

"identical to the coverage provided under the plan to similarly

situated beneficiaries under the plan with respect to whom a

qualifying event has not occurred," 29 U.S.C. 1162(1), and

"[i]f coverage is modified under the plan for any group of

similarly situated beneficiaries, such coverage shall also be

modified in the same manner for all individuals who are qualified

beneficiaries under the plan pursuant to [COBRA] . . . ." Id.

An employer which fails to provide elective "continuation cover-

age" under the terms of the statute is subject to unfavorable tax

3The period of entitlement to "continuation coverage" may be
extended or shortened, depending on the occurrence of certain
events within the preceding coverage term. See, e.g., 29 U.S.C.

1162(2)(A)(ii) (occurrence of additional qualifying event,
within initial period of "continuation coverage," may extend term
of COBRA coverage); id. at 1162(2)(A)(v) (covered employee's

eligibility for "continuation coverage" terminates with Medicare
eligibility).

9

treatment, see 26 U.S.C. 4980B (1989), amending 26 U.S.C.

162(i)(2) (1988), and to civil suit by affected "qualified

beneficiaries," see 29 U.S.C. 1132(a). A plan administrator

which fails to provide a "qualified beneficiary" with timely

notice of her rights under COBRA is subject to personal liability

not exceeding $100 per day. See 29 U.S.C. 1132(c)(1); see

generally Jeffrey D. Mamorsky, Employee Benefits Law: ERISA and

Beyond, 10.07 et seq. (2d ed. 1993) (discussing COBRA and

subsequent amendments).

The Gaskells' Coverage

The Coop does not contest its obligation, under COBRA,

to provide the Gaskells with "continuation coverage," at their

election and expense, for a minimum of eighteen months after the

occurrence of a "qualifying event." See 762 F. Supp. at 1541.

Instead, the Coop contends that the relevant "qualifying event"

occurred on January 14, 1987, when David Gaskell first went on

full disability leave, "reducing his hours" from forty per week

to zero. See 29 U.S.C. 1163 ("reduction of hours . . . of the

covered employee's employment" as potential qualifying event).

On the Coop's reasoning, therefore, its eighteen-month "continua-

tion coverage" obligation expired on July 14, 1988, and the Coop

had no legal duty to continue Carolyn's coverage further based on

David's subsequent Medicare eligibility on July 1, 1989. We

agree with the Coop's reading of the statute, but find no record

evidence to support its allegation that group plan coverage

terminated as a result of David's disability leave on January 14,

10

1987. Accordingly, we must remand for further fact finding on

this issue.

Under COBRA, "the term 'qualifying event' means, with

respect to any covered employee, any . . . [termination or reduc-

tion in hours] which, but for the continuation coverage required

under this part, would result in the loss of coverage of a

qualified beneficiary . . . ." 29 U.S.C. 1163 (emphasis

added). As the district court noted, see 762 F.Supp. at 1542,

this statutory language offers no explicit guidance in determin-

ing the relevant "qualifying event" where, as here, the em-

ployee's termination or reduction in hours does not coincide with

the "loss of coverage" under the employer's plan. In these

circumstances, the district court elected to view the "qualifying

event" as "the point at which [the employee] experience[d] a loss

of coverage as a consequence of the reduction in hours." Id. at

1543 (emphasis added). Other courts, by contrast, have measured

the eighteen-month period from the event itself, viz., the

employee's termination or reduction in hours, so long as that

event "eventually resulted in the loss of . . . health coverage."

See, e.g., Phillips v. Riverside, Inc., 796 F. Supp. 403, 411

(E.D. Ark. 1992) (holding that employer's "gratuitous" provision

of three months' continued coverage must be credited towards

employer's eighteen-month COBRA "continuation coverage" obliga-

tion once belated notice has been given to the employee); see

also Hubicki v. Amtrak Nat. Passenger R. Co., 808 F.Supp. 192,

197 (E.D.N.Y. 1992) (noting, without resolving, possible alterna-

11

tive readings of statute).

Since we agree with the district court that either

reading is plausible, based on the statutory language, we consult

the available legislative history. See Concrete Pipe & Prods.,

Inc. v. Construction Laborers Pension Trust, 113 S.Ct. 2264, 2281

(1993) ("we turn, as . . . in the usual case of textual ambigu-

ity, to the legislative purpose as revealed by the history of the

statute"); United States v. Alky Enterprises, Inc., 969 F.2d

1309, 1314 (1st Cir. 1992) ("where the language of a statute is

ambiguous on its face, we should look . . . to the legislative

history in order to ascertain Congressional intent"); see gener-

ally Stephen J. Breyer, On The Uses of Legislative History in

Interpreting Statutes, 65 S. Cal. L. Rev. 845 (1992) (discussing

proper use of legislative history in ascertaining congressional

intent where statute is ambiguous). COBRA's legislative history

leads us to conclude that Congress intended an employee's eigh-

teen-month period of continuation coverage to commence with the

event leading, under the terms of the plan, to loss of coverage,

rather than upon the loss of coverage itself.

First, while the House Reports accompanying the various

versions of the statute are silent or ambiguous on the issue,4

the "continuation coverage" provisions in the House bill were

4See H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, 45,

reprinted in 1986 U.S.C.C.A.N. 579, 622-23 (no discussion of

issue); H.R. Rep. No. 320, 99th Cong., 2d Sess. 319-20, reprinted

in 1986 U.S.C.C.A.N. 756, 970-71 (noting, without elaboration,

that 1163 "defines qualifying event").

12

incorporated virtually without change into the final Conference

bill,5 and the Report of the Senate Finance Committee, which

accompanied the final Conference version, is reasonably explicit.

It provides, in pertinent part, that:

Th[e] 18-month period [of continuation cover-
age] includes, and is not in addition to, any
continuation period presently permitted under
local law. Thus, for example, if the plan
presently provides that dependent coverage
ceases one month after the date of an em-
ployee's death, the bill would require that
beneficiaries be entitled to elect continu-
ation coverage for up to 18 months following
the date of death, not the 18-month period
beginning with the actual cessation of cover-
age one month after the employee's death.

See S. Rep. No. 146, 99th Cong., 2d Sess. 3, 365, reprinted at

1986 U.S.C.C.A.N. 42, 324. We perceive no basis, in the legisla-

tive history, for the Gaskells' proposed distinction between

"blended" coverage and "stacked" coverage.6 Moreover, the

Senate Finance Committee Report, referring to "any continuation

period presently permitted," see id. (emphasis added), appears to

undermine the basis for such a distinction.

Second, the Proposed Regulations issued by the Treasury

Department, the only administrative interpretation of the statute

5Compare Pub.L. 99-272 10001-02 with H.R. Conf. Rep. No.

99-543, at 162-72 (text of H.R. 3128, 10001-02 (rejected by
the House, December 19, 1985)).

6As explained in the Gaskells' appellate brief, "blending"
of coverage occurs when "the employer wishes to pay for the
employee's coverage for part or all of the COBRA period," after
giving timely notice to the employee of the occurrence of a
qualifying event. "Stacking" of coverage occurs "when the
employer provides coverage . . . for some period after termina-
tion without complying with COBRA and then gives the notice."

13

proffered to date, appear to take a similar position. See Prop.

Treas. Reg. 1.162-26, 52 Fed. Reg. 22,716 (proposed Apr. 6, 1987;

to be codified at 26 C.F.R. pt. 1), at Q&A-18 ("a loss of cover-

age need not occur immediately after the event, so long as the

loss of coverage will occur before the end of the maximum cover-

age period"); see also id. at Q&A-39 ("The end of the maximum

coverage period is measured from the date of the qualifying event

even if the qualifying event does not result in a loss of cover-

age under the plan until some later date") (emphasis added).7

The Proposed Treasury Regulations have not yet been finalized,

are apparently on hold pending further revisions, see 56 Fed.

Reg. 53803-03 (1991), and, accordingly, are not authoritative.

See Oakley v. City of Longmont, 890 F.2d 1128, 1133 (10th Cir.

1989) (Treasury Department's interpretation of COBRA not authori-

tative "[u]ntil the agency completes formal rule-making and

promulgates final regulations"), cert. denied, 494 U.S. 1082

(1990); see also Sirkin v. Phillips Colleges, Inc., 779 F. Supp.

751, 755 (D. N.J. 1991) (declining to apply proposed Treasury

regulation). Nevertheless, pending promulgation of final regula-

7In enacting COBRA, Congress delegated responsibility for
the issuance of interpretive regulations to three separate
agencies: the Departments of Treasury, Labor, and Health and
Human Services. See, e.g., 26 U.S.C. 7801, 7805 (Secretary of

Treasury authorized to "prescribe all needful rules and regula-
tions for the enforcement of this title"); 29 U.S.C. 1168
(Secretary of Labor authorized to "prescribe regulations to carry
out the [continuation coverage] provisions"). To date, only the
Treasury Department has proposed regulations under the statute.
See generally Johnson v. Reserve Life Ins. Co., 765 F. Supp.

1478, 1480-83 (C.D. Cal. 1991) (discussing regulatory overlap in
COBRA provisions).

14

tions, the Internal Revenue Service has announced that it "will

consider compliance with the terms of these proposed regulations

to constitute good faith compliance with a reasonable interpreta-

tion of the statutory requirements." See 52 Fed. Reg. 22,716.

Accordingly, some courts have relied on the Proposed Regulations,

notwithstanding their interim status, to define the scope of

employers' duties under COBRA. See Branch v. G. Bernd Co., 955

F.2d 1574, 1581 (11th Cir. 1992) (finding that proposed regula-

tions "represent the proper construction of COBRA in light of

Congress' intent"); see also Lincoln Gen. Hosp. v. Blue

Cross/Blue Shield of Nebraska, 963 F.2d 1136, 1142 (8th Cir.

1992) (Proposed Regulations show "regular practice" under COBRA);

Communications Workers of America v. NYNEX Corp., 898 F.2d 887,

888-89 (2d Cir. 1990) (citing Proposed Regulations).8

Finally, our reading accords with the interpretation

adopted by Congress in amending COBRA through the Miscellaneous

ERISA Amendments Act of 1989. See H.R. No. 101-247, 101st Cong.,

1st Sess. 52 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 1944

(under the original version of the statute, "[i]f the laid-off

employee . . . elects continuation coverage, the maximum period

of that coverage is measured from the date of the layoff, al-

though the period an employer has to notify the employee that he

8Moreover, we note that the Proposed Treasury Regulations
are invoked, at various points, by both parties in their appel-
late briefs. Cf. W.R. Grace & Co. v. United States E.P.A., 959

F.2d 360, 366 n.14 (1st Cir. 1992) (agency's interim, non-final
regulations do not control appeal, but may be considered upon
both parties' application "for the limited purpose of bolstering
. . . analysis").

15

or she has the right to elect continuation coverage does not

begin to run until group health coverage is lost.") (emphasis

added). Although the views of a subsequent Congress obviously

are not binding in determining the intent of an earlier legisla-

ture, see, e.g., United States v. American Heart Research Fund,

No. 92-2108, slip op. at 8 (1st Cir. June 18, 1993); United

States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874

F.2d 20, 31 (1st Cir. 1989), "such views are entitled to signifi-

cant weight . . . and particularly so when the precise intent of

the enacting Congress is obscure." Seatrain Shipbuilding Corp.

v. Shell Oil Co., 444 U.S. 572, 596 (1980) (citation omitted);

see also United States v. Ven-Fuel, Inc., 758 F.2d 741, 758 (1st

Cir. 1985); Roosevelt Campobello Int'l Park Comm'n v. United

States E.P.A., 711 F.2d 431, 436-37 (1st Cir. 1983). As the

accretion of evidence is compelling, we conclude that the Gas-

kells' eighteen-month "continuation coverage" period ran from the

date of the event which triggered David's loss of benefits under

the terms of the Coop's group insurance plan, and not from July

1, 1988, when the Coop ceased its voluntary provision of employ-

er-paid group plan insurance and the Gaskells' self-paid "contin-

uation coverage" commenced.9

9We acknowledge the potential harsh effects of our inter-
pretation, which effectively shifts to "qualified beneficiaries"
the responsibility to ascertain when a "qualifying event" has
occurred which would eventuate in the inexorable loss of a
contract-right to coverage under the employer's plan even if
that event precedes by days or months the actual loss of plan

coverage, the provision of notice by the plan administrator, and
the commencement of any unexpired "election" period. See 29

U.S.C. 1165(1)(A) ("election period . . . begins not later than

16

An important issue remains: whether, under the terms

of the Coop's group insurance plan, David's loss of group plan

eligibility inexorably was triggered by the commencement of his

disability leave (January 14, 1987), by his resignation

(January 14, 1988), or by some other event. It is the terms of

the plan that matter in defining the appropriate "trigger"; thus,

David's reduction in hours is not a "qualifying event" if it is

not so designated in the plan, even if it might have been desig-

nated as such, and regardless of the fact that it may ultimately

have led to the eventual occurrence of a "qualifying event" which

was so designated. See, e.g., Jachim v. KUTV, Inc., 783 F.Supp.

1328, 1332 (D. Utah 1992) (rejecting employee's claim that

"reduction in hours" was a "qualifying event," where plan provid-

ed no cessation of coverage until employee's actual termination).

The record does not contain a copy of the Blue Cross

the date on which coverage terminates"). For example, if a
"qualified beneficiary" of a plan which offers no conversion
option fails to recognize the covered employee's reduction in
hours as a "qualifying event," and no notice is provided by the
plan administrator, the qualified beneficiary may find her
continuation coverage abruptly terminated, some months later,
with little or no time to arrange for alternative insurance. The
Gaskells argue, with considerable force, that this result is
inconsistent with COBRA's general remedial purpose, see National

Companies Health Ben. Plan v. St. Joseph's Hosp., Inc., 929 F.2d

1558, 1572-73 (11th Cir. 1991), to avoid sudden losses in cover-
age. However, in the ordinary case, this sequence of events will
be forestalled by the plan administrator's provision of timely
notice under 29 U.S.C. 1166(a) ("In accordance with regulations
prescribed by the Secretary . . . . (4) the administrator shall
notify . . . any qualified beneficiary with respect to [a quali-
fying] event . . . of such beneficiary's rights under this
subsection"). Penalties may be enforced against plan administra-
tors who fail to provide such notice. See id. at 1132(c)(1).

17

group insurance plan; and, with respect to the "triggering event"

which led to cessation of plan coverage, the district court

concluded that "there [was] no evidence concerning the Coop's

policy with regard to the provision of benefits to employees on

disability leave," see 762 F.Supp. at 1541 n.4. Since we may

uphold the judgment on the pleadings only if "it appears beyond

doubt that the plaintiff can prove no set of facts in support of

[its] claims which would entitle [it] to relief," Conley v.

Gibson, 355 U.S. 41, 45-46 (1957) (emphasis added), and it is

impossible to determine from the present record whether going on

full disability leave would automatically "trigger" a cessation

of David's contractual entitlement to employer-paid group plan

insurance benefits, cf. Charles v. Des Plaines Pub. Co., Inc.,

No. 91-C-01288 (N.D. Ill. June 4, 1991), U.S. Dist. LEXIS 7806,

*5 (noting employee's failure to allege facts showing entitlement

to group insurance during disability leave), the district court

judgment was at least premature.10 We accordingly vacate the

judgment, and remand for further proceedings.

10For similar reasons, we decline to rule on the Gaskells'
alternate argument, that principles of equitable estoppel require
the Coop to provide "continuation coverage" under its plan for
eighteen months beyond July 1, 1988. Even assuming that the
defense of equitable estoppel is available to COBRA benefici-
aries, upon a proper showing, where the terms of a plan are
otherwise ambiguous, see National Companies Health Plan, 929 F.2d

at 1572-73, a preliminary showing of ambiguity is required;
"'estoppel may not be invoked to enlarge or extend the coverage
specified in a contract.'" See id. at 1572 n.13 (quoting Kane v.

Aetna Life Ins., 893 F.2d 1283, 1285 n.3 (11th Cir.), cert.

denied, 111 S.Ct. 232 (1990)). Since the Blue Cross group plan

contract with the Coop is not part of the record, we cannot
determine whether the ambiguity showing can be met here.

18

Since the remaining arguments raised by the Gaskells on

appeal turn on the terms of the plan contract, and the validity

of the district court's finding that "the Coop was . . . obligat-

ed [under the terms of the contract] to provide health plan

coverage to the Gaskells for a period beginning July 1, 1988,"

see 762 F. Supp. at 1543, appellate resolution of these issues

must await evidence of the terms of the plan contract, and

district court reconsideration of the Coop's COBRA liability, on

remand. We accordingly vacate the judgment, and remand for

further proceedings.

19

The district court judgment is vacated and the case is

remanded for further proceedings consistent herewith.

20